MBL (USA) CORPORATION, Plaintiff-Appellant, *v*. FREDERICK J. DIEKMAN *et al.*, Defendants-Appellees.

First District (2nd Division)   No. 82—1029

Opinion filed January 25, 1983.—Rehearing denied March 1, 1983.

James R. Mitchell, Jerrold E. Fink, and Nancy E. Sasamoto, all of Chicago, for appellant.

Rosemarie J. Guadnolo and Leonard Saphire-Bernstein, both of Arvey, Hodes, Costello & Burman, of Chicago, for appellees.

PRESIDING JUSTICE DOWNING delivered the opinion of the court:

This is an interlocutory appeal of the trial court's order of April 29, 1982, denying plaintiff MBL (USA) Corporation's motion for a

preliminary injunction and dissolving a temporary restraining order entered on December 23, 1980. Plaintiff seeks to enjoin the alleged misappropriation and disclosure of its trade secrets and other confidential proprietary information by defendant, a former employee of plaintiff. After a lengthy hearing, the trial court, basing its decision upon 48 specific findings and its conclusions of law, determined that there was no likelihood of plaintiff's success at trial on the merits. Plaintiff contends that the decision is contrary to the manifest weight of the evidence and therefore an abuse of discretion.

At trial, plaintiff asserted that its trade secrets and proprietary information were being misappropriated and disclosed to third persons by defendant in violation of an employer-employee confidentiality agreement and defendant's fiduciary duty. In its decision, the trial court summarized what plaintiff considered to be its trade secrets as follows:

"1. A production process and technology which enables Chemi-Flex [a division of plaintiff corporation] to produce urethane flat belts and timing belts and products within an extremely short cycle time (often six minutes or less) through a centrifugal molding technique which does not require the use of a vacuum to degas (or eliminate entrapped air from) the urethane or reinforcing materials at any stage of the production process. This technology includes, in combination, the use of unique specialized molds and molding machinery; the use of centrifugal forces ([sic] or the angular speeds which are related to the r.p.m. and the diameter of the mold utilized substantially in excess of those generally used or known in the industry; the heating of the urethane compounds to temperatures substantially lower than those recommended, specified and used in the industry; the use of a temperature differential between that of the mold and molding machine and the temperature of the urethane mix poured into the mold; and the use of a 'pot life' for the urethane compound substantially less than that generally used in the industry;

2. The design specifications for the molds, machinery and equipment used by Chemi-Flex;

3. The product specifications and formulas used by Chemi-Flex in the manufacture of urethane belts and products for its customers;

4. The identities of the customers of Chemi-Flex and the data, including production and product data, developed by Chemi-Flex with respect to such customers and products; and

5. Specialized products and molds, including the Teletype Corporation carrier belts, multi-durometer (or hardness) belts and products, such as the Teletype Corporation bumpers and IBM tractor belts; 'six-hold,' or 'six-cavity,' molds; and a system of interchangeable mold cores and barrels."

Plaintiff is owned by two Japanese corporations. Plaintiff purchased all the stock of Chemi-Flex, Inc., an Illinois corporation manufacturing urethane timing belts and flat belts and related products. Chemi-Flex, Inc., was formed by Earnest Meeder. Defendant[1] and Meeder met while both were employed at the J. W. Johnson Company. Defendant was hired at J. W. Johnson beginning in 1968, as a summer assistant during high school and college. Defendant received an engineering degree from Iowa State University in 1972, then was employed full-time by Chemi-Flex. Defendant was employed in various positions at Chemi-Flex until he was fired in 1978. Defendant was rehired by Chemi-Flex in February of 1979 after plaintiff had purchased Chemi-Flex. Defendant was again fired from his position as production manager in September 1979.

Defendant assisted Earnest Meeder in the ongoing development of the centrifugal molding process, now claimed as a trade secret, beginning with his summer employment at J. W. Johnson and continuing through September 1979. Even during the period that defendant was not employed full-time with Chemi-Flex between February 1978 and February 1979, he served as a consultant to Chemi-Flex.

Earnest Meeder purchased the centrifugal molding machine he was developing at J. W. Johnson Company and in 1971, formed Chemi-Flex, Inc. Throughout the corporate existence of Chemi-Flex, Inc., many people, including defendant, assisted in the ongoing development of the centrifugal molding process culminating in 1978 with the use of 15 machines designed to accommodate production needs.

While employed by Chemi-Flex from 1972 through 1978, defendant was restrained by an employer-employee confidentiality agreement.[2] However, when defendant was rehired in 1979, he refused to

---

[1]The other named defendants in this suit are two corporations formed by defendant, Diekman.

[2]Those who signed the employer-employee agreement agreed not to disclose to any person or corporation the various aspects of the employer's product and/or process imparted to them during the course of their employment. By signing the agreement, the employee recognized that the employer has, or would, impart certain knowledge to the employee not to be disclosed to others during or after their term of employment. Following employment, the employee agreed not to compete in a similar business for five years.

sign such an agreement when asked to do so by plaintiff's president, believing it was too restrictive and unfair. No further discussions about the agreement took place, and defendant never signed the agreement. In September 1979, defendant was again fired. According to defendant, he was fired because of continuing disputes over company hiring policies and the manner in which the company was being run. Although defendant stated that he was fired at that time, one of plaintiff's officers testified that defendant left the company voluntarily.

Following his second tenure with Chemi-Flex, defendant formed two companies, Surface Additions, Inc., and FBN Industries, Inc., and began to design centrifugal molding machines and designs for other belt-producing equipment. A Chemi-Flex division employee assisted defendant in the production of blueprints for defendant's molding machines.

When plaintiff's officers learned of defendant's activities, a letter was sent to defendant requiring that he comply with the employer-employee agreement which he signed in 1972. He was also requested to make certain disclosures regarding his designs and other business activities. Defendant did not respond to these demands whereupon plaintiff brought this action. The trial court entered a temporary restraining order on December 30, 1980. A hearing on plaintiff's motion for a preliminary injunction, which began on May 4, 1981, lasted nearly one year and involved extensive testimony and voluminous documentary evidence. On April 29, 1982, the trial court entered its order denying plaintiff's motion for a preliminary injunction and dissolved the December 23, 1980, temporary restraining order.

I

Plaintiff strongly urges that the trial court abused its discretion when it denied plaintiff's motion for a preliminary injunction and that the court's findings that plaintiff's process, technology, machinery, customer data and production specifications are not protectible as trade secrets are contrary to the manifest weight of the evidence. We cannot agree.

"In order to prevail on a motion for a preliminary injunction a plaintiff must prove that: (1) a clearly ascertained right exists which needs protection; (2) irreparable injury will occur without the protection of an injunction; (3) the remedy at law is inadequate; and (4) there is a likelihood of success on the merits of the case." (*Lincoln Towners Insurance Agency v. Farrell* (1981), 99 Ill. App. 3d 353, 355, 425 N.E.2d 1034.) The trial court here determined that the evidence

failed to show a likelihood of plaintiff's success on the merits. In showing a likelihood of success on the merits " '*** a party is not required to make out a case which will in all events warrant relief at the final hearing. All that is necessary is that the petitioning party raise a fair question as to the existence of the right claimed ***.' " (*Capsonic Group, Inc. v. Plas-Met Corp.* (1977), 46 Ill. App. 3d 436, 438, 361 N.E.2d 41, citing *Grillo v. Sidney Wanzer & Sons, Inc.* (1975), 26 Ill. App. 3d 1007, 1013, 326 N.E.2d 180.) On review, the question to be addressed is whether the evidence at trial was "so strong and convincing" (*Andrea Dumon, Inc. v. Pittway Corp.* (1982), 110 Ill. App. 3d 481, 486) in plaintiff's favor that this court is compelled to reverse the judgment of the trial court (110 Ill. App. 3d 481, 486).

Plaintiff argues that the evidence shows that the trial court abused its discretion by failing to find that plaintiff's process, machinery and customer data were entitled to trade secret protection. Plaintiff properly points out, relying upon *ILG Industries, Inc. v. Scott* (1971), 49 Ill. 2d 88, 92, 273 N.E.2d 393, that a trade secret is generally described "as a plan or process, tool, mechanism, compound, or informational data utilized by a person in his business operations and known only to him and such limited other persons to whom it may be necessary to confide it." As trade secrets are subject to variations depending upon the facts, an exact definition of trade secret is not always possible. Some factors a court may consider in determining whether the particular information is one's trade secret are: "(1) the extent to which the information is known outside of his business; (2) the extent to which it is known by employees and others involved in his business; (3) the extent of measures taken by him to guard the secrecy of the information; (4) the value of the information to him and to his competitors; (5) the amount of effort or money expended by him in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others." *ILG Industries, Inc. v. Scott* (1971), 49 Ill. 2d 88, 93, citing Restatement of Torts sec. 757, comment b, at 6.

The evidence and testimony reveals that the process and machines of plaintiff had been developed over a long period of time with the assistance of defendant and others, and that defendant was exposed to these developments, in part, prior to being employed by plaintiff. Advances in the development of the process and machinery continued throughout defendant's relationship with plaintiff and continue today. Plaintiff offered into evidence a letter sent by defendant to one of plaintiff's customers which plaintiff argues shows that defendant ac-

knowledged the uniqueness of plaintiff's process. In the letter, defendant pointed out the advantages of allowing defendant to supply urethane belts to the customer using the same machinery and process as plaintiff, but defendant does not claim that the process is a new, or as yet unknown, invention. Defendant also solicited financial backing to improve on the known process as a possible alternative to the customer's method of operation. " '[M]ere mechanical advance in the use of a process is not a new process or discovery [entitled to protection]. To be a new process there must be employed creative faculties in originating it amounting to a meritorious discovery or invention. ' " (*Andrea Dumon, Inc. v. Pittway Corp.* (1982), 110 Ill. App. 3d 481, 486-87, citing, *Victor Chemical Works v. Iliff* (1921), 299 Ill. 532, 546-47, 132 N.E. 806.) The evidence here supports the trial court's conclusion that plaintiff was unlikely to succeed on the merits.

In support of its assertions that its entire process is a protectible trade secret, plaintiff relies heavily upon the testimony of its witnesses, especially its expert witness, Dr. Lawrence Broutman. Plaintiff strongly urges that the trial court misinterpreted the testimony of defendant's expert, Professor Kurt C. Frisch. The degree to which the process is known in the industry was the focus of testimony offered by the experts. Plaintiff's expert focused on the quality of the finished product in light of plaintiff's entire process, using its own machines, when compared to the quality of other companies such as Barry Instrument Corp., whose president testified that they also do not utilize a vacuum in their process. Defendant's expert stated that the use of this process was indeed known in the industry, although the Chemi-Flex process was not specifically discussed in any industry literature. In its brief, plaintiff re-examined the patents, literature and scientific documents it believed defendant's expert examined, or should have examined, in preparation for his testimony and concluded that the trial court erred by not viewing Professor Frisch's testimony as incredible in light of plaintiff's own expert presentation and interpretation of the evidence. But it is well known that "in a bench trial it is within the province of the trial court to determine the credibility and weight of the testimony, to resolve the inconsistencies and conflicts, and to render its decision accordingly" (*People v. Green* (1982), 104 Ill. App. 3d 278, 284, 432 N.E.2d 937, *appeal denied* (1982), 91 Ill. 2d 25), and a court of review cannot substitute its judgment on these matters unless the findings are against the manifest weight of the evidence (*Greer v. Carter Oil Co.* (1940), 373 Ill. 168, 179, 25 N.E.2d 805).

■ A review of the record supports the trial court's determina-

tion that there was no likelihood of success on the merits by plaintiff in light of evidence that the process is generally known in the industry. Specifically, the trial court found the following to be generally known in the industry: (1) the fact that reinforced urethane belts could be manufactured by means of a centrifugal process without the use of a vacuum; (2) the use of centrifugal molding machines (without a vacuum), slitting machines, demolding processes, winding machines and belt molds; (3) the use of the ingredients which plaintiff utilizes; (4) the use of a process with the range of proportions of ingredients and conditions used in producing plaintiff's belts. Our review of the record reveals that these findings are not contrary to the manifest weight of the evidence and will not be set aside.

## II

Plaintiff argues that the trial court should have concluded that the evidence of their security measures, such as the employer-employee agreement, demonstrates that plaintiff treated its entire operation, including equipment and customer information, as a trade secret.

## A

Plaintiff asserts that even if other companies utilize the same process of molding urethane, the uniquely integrated use of the known elements with plaintiff's in-house machinery and the security measures utilized by plaintiff qualifies their system for trade secret protection. This assertion is not supported by the record. Some employees, but not all, signed the employer-employee agreement restricting the disclosure of information imparted to them during and after their employment. Defendant refused to sign the agreement upon request when re-employed and was allowed to continue in plaintiff's employ for five months. There is no evidence that defendant's failure to sign the agreement was a reason for his employment being terminated.

Following termination, a former employee can be enjoined from taking or using his former employer's trade secrets (*Capsonic Group, Inc. v. Plas-Met Corp.* (1977), 46 Ill. App. 3d 436, 439, 361 N.E.2d 41), and he may not take confidential, particularized plans or processes developed by his employer and disclosed to him while the employer-employee relationship exists. However, an employee may "take with him general skills and knowledge acquired during his former employment." (*Packard Instrument Co. v. Reich* (1980), 89 Ill. App. 3d 908, 917, 412 N.E.2d 617.) The record shows that defendant was utilizing his general skills and knowledge which he acquired dur-

ing his employment with plaintiff and Chemi-Flex. Additionally, plaintiff's failure to require defendant and other employees to sign the employer-employee agreement does not demonstrate the deep concern for security presently claimed by plaintiff.

### B

Plaintiff argues that the trial court erred in finding that the employer-employee agreement was unenforceable as a matter of law. It is well known that Illinois courts favor fair competition in business and do not encourage restraints of trade; therefore, restrictive covenants are closely scrutinized. (*Image Supplies, Inc. v. Hilmert* (1979), 71 Ill. App. 3d 710, 713, 390 N.E.2d 68.) Such covenants will be enforced "only if the time limit and geographic scope are reasonable, trade secrets or confidential information are involved, and the restriction is reasonably necessary for the protection of a legitimate business interest." *Image Supplies, Inc. v. Hilmert* (1979), 71 Ill. App. 3d 710, 713; see *Dunn v. Shepherd* (1975), 25 Ill. App. 3d 825, 826-27, 323 N.E.2d 853; accord, *Booth v. Greber* (1977), 48 Ill. App. 3d 213, 219-20, 363 N.E.2d 6, *appeal denied* (1977), 66 Ill. 2d 628.

It is therefore necessary for plaintiff to demonstrate the existence of a protectible business interest or that defendant was exposed to confidential information through his employment in order to justify the enforcement of a restrictive covenant. (*Image Supplies, Inc. v. Hilmert* (1979), 71 Ill. App. 3d 710, 713.) Here, the trial court found that it was unlikely that plaintiff could show that a protectible business interest existed. We agree.

Further, the testimony did not establish that the employees were aware of what information plaintiff considered to be confidential. If, as in this case, it is unlikely that plaintiff is able to establish the existence of a protectible business interest, a restrictive covenant would not be a reasonable necessity for the protection of plaintiff's business and would, therefore, be unenforceable. Failure to establish such a protectible interest lessens the possibility of showing the existence of irreparable injury and the need for injunction relief. See *Donald McElroy, Inc. v. Delaney* (1979), 72 Ill. App. 3d 285, 294, 389 N.E.2d 1300.

■ The trial court here did not find the agreement unenforceable due to plaintiff's inability to establish a protectible business interest at trial, but rather found the agreement to be "vague and over broad in time and over broad in geographical coverage" and therefore unenforceable as a matter of law. The question of enforceability is a matter of law to be decided on the particular facts of each case. (*Donald*

*McElroy, Inc. v. Delaney* (1979), 72 Ill. App. 3d 285, 293.) Although we feel, based on our review of the record, that the trial court arrived at the proper conclusion regarding the enforceability of the agreement, we do not agree with the basis for such conclusion. The agreement would be unenforceable if plaintiff is unable to establish the existence of a protectible business interest. We therefore find that although the trial court reached the right conclusion but for the wrong reason, the error does not require reversal. *In re Estate of La Rue* (1964), 53 Ill. App. 2d 467, 475, 203 N.E.2d 47.

C

The record contains other evidence which supports the trial court's conclusion that plaintiff was unlikely to prove the existence of a trade secret. Such evidence, showing a further lack of security measures by plaintiff, includes the facts that plans, designs and customer data were not locked up; customer names and orders were not marked confidential; process formulas and machines were shown, without restriction, to employees, outside consultants and others; no licensing or confidentiality agreements were signed by outside parties with access to the process and formulas; no evidence was presented to the trial court showing the specific items that plaintiff considered to be confidential; and the entire process, formula and machinery were open to a team of engineers from a stockholder corporation of plaintiff who, along with an Austrian corporation, is now involved in a joint venture to supply urethane belts to companies in Europe.

■ Such facts do not show that plaintiff utilized security measures designed to protect its process as a trade secret. (See *United States Plywood Corp. v. General Plywood Corp.* (6th Cir. 1966), 370 F.2d 500, 508, *cert. denied* (1967), 389 U.S. 820, 19 L. Ed. 2d 71, 88 S. Ct. 39 (where the court found no breach of confidentiality when the defendant failed to warn its employees against disclosure and no agreements were signed).) Here, the court found that defendant and other employees were not told what, if anything, plaintiff considered confidential. (See *McGraw-Edison Co. v. Central Transformer Corp.* (8th Cir. 1962), 308 F.2d 70, 74 (where the court determined that at no time did plaintiff consider its "know-how" or method of production as confidential in relation to employees or visitors to its plant).) Although many factors should be considered to determine if a trade secret exists, what is of primary importance is "whether and how an employer acts to keep the information secret." (*Lincoln Towers Insurance Agency v. Farrell* (1981), 99 Ill. App. 3d 353, 356, 425 N.E.2d 1034.) We find that the instant record does not support plain-

tiff's contention that their security measures demonstrate that a protectible trade secret exists.

## D

Plaintiff also contends that the identity of its customers and its customer needs are protectible trade secrets. However, plaintiff failed to offer evidence of a customer list, or of steps taken by plaintiff to prevent its customers' names or formula requirements from disclosure. Customer names and specifications were on orders and requisitions located in various places in the plant—in some cases posted on the wall near the machines. This court, in *Lincoln Towers*, set forth a succinct discussion of Illinois authority regarding the qualification of customer lists as trade secrets. Illinois courts have found that a customer list or other customer information constitutes a trade secret where the list has been developed by the employer over a number of years at great expense and the employer has kept the list or information under lock and key. *Lincoln Towers Insurance Agency v. Farrell* (1981), 99 Ill. App. 3d 353, 357-58.

■ The same information was held not to be a trade secret in instances where it had not been treated as confidential and secret by the employer, the information was commonly known or could have been easily duplicated, and where the customers were known to the employer's competitors. (*Lincoln Towers Insurance Agency v. Farrell* (1981), 99 Ill. App. 3d 353, 358.) Here, there was no evidence of a confidential customer list or that customer information was kept under lock and key. Plaintiff's actions as revealed by the testimony shows a lack of security measures and confidential treatment of customer names and requirements. Therefore, it cannot be said that the trial court's findings were contrary to the manifest weight of the evidence.

## E

The trial court's conclusions of law state in part that "there was no showing that there is a likelihood of success on the merits at trial in proving that Diekman breached any fiduciary duty." An employee can be shown to have breached his confidential relationship with his employer where he acts in a manner inconsistent with his employer's interests during his employment by copying or memorizing trade secret information for use in soliciting his employer's customers or in developing a competing product. (*Lincoln Towers Insurance Agency v. Farrell* (1981), 99 Ill. App. 3d 353, 358-59.) *Lincoln Towers* and other cases relied upon by plaintiff presumes the existence of either an

agreement of nondisclosure or a fiduciary relationship as the basis of relief. The facts in this record do not support a conclusion that defendant was obliged either by contract or relationship to the plaintiff. Further, the authorities relied on by plaintiff presumed the existence of a protectible interest which has not been shown here. In its conclusion, the trial court properly stated that its decision was not a determination of the ultimate issues in the case but was addressed to the plaintiff's likelihood of success on the merits at trial.

■ In reviewing the result reached by the trial court, we are not to determine conclusively if plaintiff possesses a trade secret, but rather to ascertain whether the trial court abused its discretion in denying the requested injunction. The decision to grant a preliminary injunction rests within the sound discretion of the trial court, and the only question we review on appeal is whether there was a sufficient showing to sustain the order of the trial court granting or denying the relief sought. (*Stocker Hinge Manufacturing Co. v. Darnel Industries, Inc.* (1978), 61 Ill. App. 3d 636, 642-43, 377 N.E.2d 1125.) Here, the record is sufficient to support the court's denial of a preliminary injunction.

### III

Finally, plaintiff contends that the trial court abused its discretion in granting defendant's motion *in limine*. We cannot agree. Defendant's motion *in limine* requested that the trial court require plaintiff to establish a *prima facie* case of misuse of, and the existence of, a trade secret before allowing plaintiff to question defendant as to his current methods, techniques and processes. Defendant's motion stated that plaintiff would be unjustly enriched and defendant irreparably harmed if plaintiff were allowed to examine defendant's methods, designs and processes.

■ Defendant wished to protect his work product which included designs and manufacturing plans compiled subsequent to his employment with plaintiff. Plaintiff argued that it should be allowed to examine defendant's documents and designs to determine what trade secrets had been misappropriated by defendant. The record reveals that not only did the trial court properly grant defendant's motion *in limine* but the trial court went to great lengths to insure fairness to both parties. "The Supreme Court Rules provide that 'the court may supervise all or any part of any discovery procedure' [citation] and enter protective orders 'as justice requires, denying, limiting, conditioning, or regulating discovery to prevent unreasonable annoyance, expense, embarrassment, disadvantage, or oppression.' [Citation.]"

(*Stocker Hinge Manufacturing Co. v. Darnel Industries, Inc.* (1978), 61 Ill. App. 3d 636, 645, 377 N.E.2d 1125.) It must also be remembered that the trial court is given wide discretion with respect to the kind and extent of hearing on a motion for preliminary injunction and its order will not be modified absent an affirmative showing of abuse. (*Stocker Hinge Manufacturing Co. v. Darnel Industries, Inc.* (1978), 61 Ill. App. 3d 636, 644.) Such is not the case here, and the trial court's order will not be disturbed.

For the reasons herein stated, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

STAMOS and HARTMAN, JJ., concur.