RONALD CORNSTUBBLE, Plaintiff-Appellee and Cross-Appellant, v. FORD MOTOR COMPANY, Defendant-Appellant and Cross-Appellee.

Fifth District   No. 5—86—0547

Opinion filed December 2, 1988.

CALVO, J., dissenting.

Joseph B. McGlynn, Jr., and John D. Wendler, both of McGlynn & McGlynn, of Belleville (John M. Thomas, of Ford Motor Company, of Dearborn, Michigan, of counsel), for appellant.

Amiel Cueto and Thomas M. Daley, both of Cueto, Daley, Williams, Moore & Cueto, Ltd., of Belleville, for appellee.

JUSTICE WELCH delivered the opinion of the court:

Defendant-appellant, Ford Motor Company, appeals from a $1,298,344 judgment entered July 28, 1986, following a bench trial in the circuit court of St. Clair County, against defendant and in favor of plaintiff-appellee, Ronald Cornstubble, in a personal injury/negligence action. The trial court found plaintiff contributorily negligent to the extent of 30% and reduced the damage award accordingly.

Defendant presents three arguments on appeal: (1) that the trial court's finding of negligence is against the manifest weight of the evidence; (2) that the trial court's finding that the defendant's negligence was the cause in fact of the plaintiff's injuries is against the manifest weight of the evidence; and (3) that the trial court's determination of damages is against the manifest weight of the evidence. Plaintiff has filed a cross-appeal challenging the trial court's finding of contributory negligence.

■ We find it necessary to discuss only the first two issues presented by defendant and reverse the trial court's findings of negligence and causation as against the manifest weight of the evidence. We do not do this lightly, for we are most mindful of the great deference we must accord the findings of fact of the trial court (*First Security Bank v. Bawoll* (1983), 120 Ill. App. 3d 787, 794, 458 N.E.2d 193, 198-99), and of our obligation to view all of the evidence in the light most favorable to plaintiff-appellee (*Ford v. City of Chicago* (1985), 132 Ill. App. 3d 408, 412, 476 N.E.2d 1232, 1236). However, where the trial court's findings are contrary to the manifest weight of the evidence, it is also our duty to reverse. *Cosmopolitan National Bank v. County of Cook* (1983), 116 Ill. App. 3d 1089, 1102, 452 N.E.2d 817, 827, *modified* (1984), 103 Ill. 2d 302, 469 N.E.2d 183.

Plaintiff, Ronald Cornstubble, sustained injuries to his back when, on October 29, 1982, he fell while exiting from the cab of a dump truck designed and manufactured by defendant, Ford Motor Company. The truck had a gas tank step system for ingress to and egress from the cab, the faulty design of which, plaintiff alleged, caused his fall and resultant injuries. Plaintiff's complaint was originally filed in two counts, one sounding in strict products liability, the other in negligence. The strict products liability count was dismissed before trial on the basis of the "statute of repose." (Ill. Rev. Stat. 1985, ch. 110, par. 13—213(b).) Therefore, the case was tried and decided under the count of the complaint alleging negligent design.

■■ Under a theory of negligence, the focus is primarily on the defendant's conduct in designing and manufacturing the product, rather than on the condition of the product itself. It is not sufficient to show that the product is defective or not reasonably safe; the plaintiff must also show that the defendant breached a duty owed to plaintiff. (*Braband v. Beech Aircraft Corp.* (1977), 51 Ill. App. 3d 296, 301, 367 N.E.2d 118, 122, *aff'd* (1978), 72 Ill. 2d 548, 382 N.E.2d 252, *cert. denied* (1979), 442 U.S. 928, 61 L. Ed. 2d 296, 99 S. Ct. 2857.) A manufacturer has a duty of due care to design and manufacture a product that will be reasonably safe for its intended and any reasonably foreseeable uses. (*Sanchez v. Bock Laundry Machine Co.* (1982), 107 Ill. App. 3d 1024, 1028, 438 N.E.2d 569, 572.) Not only must plaintiff prove that the product was not reasonably safe, but also that the defendant knew or, in the exercise of ordinary care should have known, that the product was not reasonably safe. (*Watts v. Bacon & Van Buskirk Glass Co.* (1959), 18 Ill. 2d 226, 232, 163 N.E.2d 425, 428.) In a negligence action, a defendant may rebut plaintiff's proof by showing its exercise of reasonable care through

evidence of its testing and inspection procedures (*Nave v. Rainbo Tire Service, Inc.* (1984), 123 Ill. App. 3d 585, 591-92, 462 N.E.2d 620, 625), or evidence that it complied with industry custom and practice. *Denniston v. Skelly Oil Co.* (1977), 47 Ill. App. 3d 1054, 1067, 362 N.E.2d 712, 722.

After viewing all of the evidence in the light most favorable to plaintiff-appellee, we find that plaintiff has failed to demonstrate that defendant did not exercise reasonable care in designing the gas tank step system, or that any defect in the gas tank step system was the cause in fact of plaintiff's injuries. We therefore reverse the judgment of the circuit court of St. Clair County.

The following evidence was adduced at trial. Plaintiff, Ronald Cornstubble, testified that he had been a construction truck driver since 1966. On the morning of his accident, plaintiff was sent by his union to work as a dump truck driver for Hoeffken Brothers Construction Company.

The truck from which plaintiff fell has a gas tank step system for ingress to and egress from the cab which consists of a single step approximately 22 inches above the ground. This step is approximately 7³/₄ to 8 inches wide, but has a curved edge which reduces the flat surface by one to two inches. There is then a 12-inch step up into the cab of the truck. The cab of the truck has a seven inch-wide sill which serves as a second step. The top of the gas tank is several inches below the sill and extends beyond the sill approximately two inches. The gas tank is embossed with a slip-resistant diamond tread approximately one-eighth of an inch thick. The dump truck had been manufactured by Ford Motor Company in 1963, but the gas tank step system had been designed by defendant some years prior to 1958.

Plaintiff had entered and exited the truck two or three times without difficulty prior to his fall. Plaintiff described his fall as follows. He was sitting in the cab behind the steering wheel. He opened the door with his left hand and held the steering wheel with his right hand. As the door opened, plaintiff began to move his left foot out of the cab. As he put his left foot down, he grabbed the "B" pillar behind the driver's door with his left hand and reached for the window sill on the open door with his right hand. He swung his body toward the outside of the cab and began to move his right foot out of the cab. His left foot was not firmly planted. Just as his right foot came down it "hit that riser or something, and I just fell." As he fell, plaintiff hit his lower back, shoulders and neck.

Plaintiff had three back surgeries following his fall. The first was to remove a lumbar disc, the second was to repair stitches from the

first surgery which had torn loose, and the third was to remove a cervical disc. Plaintiff continued to have pain at the time of trial and testified that he was unable to do any physical work.

Plaintiff called Dr. Howard Harrenstien as his expert witness on the issues of negligence and causation. Dr. Harrenstien has a B.S. degree in architectural engineering, an M.S. degree in civil engineering and a Ph.D. degree in theoretical and applied mechanics, which he described as

"the study of the effect of forces on bodies at rest and in motion and the prediction of their behavior, both external and internal. It deals with statics, dynamics, strength of materials, experimental stress analysis, elasticities, plasticity, similitude in engineering, things of that sort."

At the time of trial, Dr. Harrenstien was employed as a professor of civil and architectural engineering at the University of Miami. He has spent most of his career in the academic arena and has never been employed in the field of automotive or truck design or manufacture. Dr. Harrenstien has never belonged to any societies or professional organizations related to automotive or truck design or manufacture. Most of Dr. Harrenstien's experience and training involves engineering design work relating to buildings or components of buildings. Dr. Harrenstien has very little, if any, specific experience or training in the field of automotive or truck design or manufacture or the design or manufacture of ingress/egress systems for trucks. Dr. Harrenstien does have experience and training in the design of stairways, ramps and ladders for ingress to and egress from buildings.

On cross-examination, Dr. Harrenstien testified that a civil engineer is not necessarily qualified to testify as an expert about the design of ingress/egress systems for trucks. Dr. Harrenstien testified, however, that the education he received in obtaining his Ph.D. degree and the work he has done since then qualifies him to review a design of a truck ingress/egress system and render opinions as an expert. He testified that his expertise in the area of truck ingress/egress systems includes his architectural background, his theoretical and applied mechanics background, his knowledge of how people ascend and descend stairways and ladders, how they climb on things and the work he has done in previous court cases in which he has testified.

Dr. Harrenstien inspected, measured and analyzed the truck and the gas tank step system from which plaintiff fell, as well as plaintiff's boots. He determined the coefficient of friction between the gas tank step and plaintiff's boot to be .545. The coefficient of friction represents the amount of force necessary to slide plaintiff's boot on

the gas tank step.

Dr. Harrenstien detailed eight ways in which he believed the gas tank step system had been negligently designed. Dr. Harrenstien's first opinion was that the design and manufacture of the gas tank step system was negligent in that its dimensions did not maintain their integrity during foreseeable uses. The step became indented with use and the diamond tread became worn smooth, thereby losing any nonslip qualities which it might have had.

Dr. Harrenstien's second opinion was that the gas tank step system was negligently designed in that the front edge of the step was rounded or curved, with an intended radius of one inch. This gradually changing slope from horizontal to vertical causes a person standing on the step to slip.

Dr. Harrenstien's third opinion was that the gas tank step system was negligently designed in that it did not have a nonslip, self-cleaning surface. Self-cleaning surfaces are open gratings which allow foreign matter to drop down off the step. These materials were known and available at the time the gas tank step system was designed. The diamond tread did not maintain its integrity, but became worn smooth. Other nonslip surfaces which would maintain their integrity were known and available at the time the gas tank step system was designed.

Dr. Harrenstien's fourth opinion regarding negligent design was that defendant did not follow well-known building construction industry standards with respect to width of steps and height of risers in stairways. He testified that the gas tank step system has all the characteristics of a portion of a stairway and therefore design engineers should have investigated stairway specifications when they designed the gas tank step system. Relying on the 1941 Miami Beach building code, he testified that in the building construction industry, the preferred height of a step from the ground is 16 inches. The height from the ground of the gas tank step was 22 inches. Further, relying on a 1968 document entitled "U.S.A. Standard Requirement for Fixed Industrial Stairs," Dr. Harrenstien testified that the gas tank step was not sufficiently wide. According to that document, stairs having a width of less than nine inches should have an open riser so that the end of the foot can extend beyond the step. The gas tank step was less than nine inches wide but had a closed riser. Finally, Dr. Harrenstien testified that the second step into the truck cab was negligently designed in that the top of the gas tank extends two inches beyond the cab sill step, creating an "inconsistent riser."

Dr. Harrenstien's fifth opinion regarding negligent design of the

gas tank step system was that it invites drivers to walk down the steps as they would a stairway and it is not discernible from the cab that it is a closed riser system upon which one can hit one's heel as one descends.

Dr. Harrenstien's sixth opinion regarding negligent design was that the rounded edge of the step and closed riser cause footwear to slide down the step, and that Ford Motor Company engineers knew or should have known this at the time they designed and manufactured the gas tank step system in question. He explained that when a foot is placed on the step, the heel hits the solid, closed riser, causing the toe to slip down the rounded edge.

Dr. Harrenstien's seventh finding with regard to negligent design was that the design does not include a safety or grab handle which would allow a conventional three-point support system for the driver. This feature was introduced in the 1960's and 1970's and was initially an optional item. Dr. Harrenstien testified that Ford Motor Company engineers should have known that a grab handle was necessary at the time they designed the gas tank step system and that they were negligent in not including one in the design. He testified that grab handles are traditionally located on the "B" pillar behind the driver's door. The use of such a grab handle would force drivers to exit the truck backwards, in the same manner that they entered the truck. This would allow the ball of the foot to be centered on the gas tank step rather than on the curved edge.

Dr. Harrenstien's final opinion relating to negligent design of the gas tank step system was that it leaks fuel onto the step, causing it to become slippery and creating a fire hazard.

Finally, Dr. Harrenstien testified to his belief that the negligent design of the gas tank step system contributed to plaintiff's fall. He also testified as to ways in which the gas tank step system could have been made safer and stated that his suggested modifications had been available at the time of the design and manufacture of the gas tank and truck. On cross-examination, Dr. Harrenstien admitted that he did not know what the custom and practice in the industry had been with respect to truck gas tank step systems at the time the subject system was designed and manufactured.

Defendant, Ford Motor Company, called three expert witnesses. The first was Edward R. Bolcer, an automotive engineer. Bolcer has a bachelor's degree in industrial engineering and a degree of master of automotive engineering from the Chrysler Institute. He also has a master of business administration degree and a diploma from the International Correspondence School in mechanical engineering.

Bolcer began working for Chrysler Corporation in approximately 1948 as an automotive draftsman. He later became a design engineer for Chrysler Corporation, specializing in truck frame design. In November 1965, he began working for Ford Motor Company as product design engineer responsible for heavy truck frames. He was promoted to the position of reliability engineer in the truck development department, then returned to the position of principal engineer for truck chassis, then became principal engineer in the vehicle design concepts department, then moved into the heavy truck advanced concepts office and finally became a component design analysis engineer for heavy trucks. At the time of trial, Bolcer was still employed by Ford Motor Company as a component design analysis engineer for heavy trucks and had worked in the trucking industry for over 23 years in the areas of design, testing, review and evaluation.

Bolcer testified at length about the system by which Ford Motor Company had evaluated new truck designs at the time the subject truck and gas tank step system were designed and manufactured. He testified that human factors evaluation would have been made in a series of steps, beginning with the construction of a cab and driver's position mock-up. The immediate driver environment would have been mocked-up, including the seat, steering wheel, controls, instruments and the ingress/egress system. This mock-up then would have been subjected to a jury evaluation.

For a jury evaluation, a group of from 12 to 50 individuals representing a broad spectrum of heights, sizes and weights would have been selected. These people would have evaluated the accessibility of controls and the ease of ingress to and egress from the vehicle.

Following the jury evaluation of the mock-up, prototype vehicles would have been built and subjected to a jury evaluation. A prototype vehicle is built by hand using temporary tooling and is as close as possible to the actual vehicle that is intended to be produced. It is capable of being driven and is driven on the manufacturer's proving grounds by professional drivers and engineers. One or two prototypes are also given to selected major truck fleets, who drive them over their ordinary routes. Finally, early production vehicles and continuing production vehicles are monitored and evaluated on a continuing basis.

All of the major truck manufacturers used a similar evaluation procedure on their newly designed trucks, and the truck and gas tank step system in question were subject to this evaluation process before being marketed.

Bolcer testified that in his employment at Ford Motor Company,

he would have become aware of any major safety problems with a 1963 Ford Motor Company truck. Other than plaintiff's, he was unaware of any complaints or lawsuits involving an ingress/egress system employing the gas tank step system on the type of truck from which plaintiff fell, from the time they were first manufactured through the time that they were discontinued. He testified that if there had been any such complaints or lawsuits, he would have been aware of them.

Bolcer also testified that he was familiar with the types of surfaces used on gas tank steps during the years 1959 to 1969 and that the diamond tread used on the gas tank step in question was commonly used in the industry at that time. In the 1960's, diamond tread was a very popular material in the automotive industry and also was used in other industries as flooring, stairs and scaffolds. To Bolcer's knowledge, the self-cleaning grating step suggested by plaintiff's expert was not commonly used in the industry. on gas tank step systems at the time the truck and gas tank step system in question were designed and manufactured. He testified that, based upon his familiarity with the truck manufacturing industry during the time period in which the truck from which plaintiff fell was manufactured, it was his belief that Ford Motor Company adhered to the standards of the truck manufacturing industry as they existed at that time, and that Ford Motor Company was not negligent in the design or manufacture of the gas tank step system or truck from which plaintiff fell.

Finally, Bolcer testified that he had inspected and measured the gas tank step system from which plaintiff fell. He further testified that the step system does have an adequate three-point support system whether the truck is exited facing forward or backward.

Defendant's second expert witness was Russell R. Noble, an automotive engineering consultant. Noble has a B.S. degree in electrical engineering and a masters degree in automotive engineering from the Chrysler Institute of Engineering. He worked for Chrysler Corporation from 1948 to 1980, and worked specifically in the area of trucks from 1950 to 1980. He was employed as a test and development engineer, project engineer, assistant chief engineer in charge of truck advance engineering, chief engineer of truck design and development, chief engineer of truck safety, reliability and advance engineering, and chief program engineer for standard trucks.

Noble testified that between 1956 and 1967, Chrysler Corporation produced a truck similar to the Ford truck from which plaintiff fell, including a similar gas tank step system for ingress and egress. He further testified that Chrysler Corporation and other major automo-

tive manufacturers used the same testing and evaluation procedures for new truck designs as did Ford Motor Company.

Noble testified that in 1963 manufacturers other than Ford Motor Company and Chrysler Corporation were offering a similar gas tank step system to that from which plaintiff fell. These other manufacturers included Dodge, Chevrolet, GMC and International Harvester. These gas tank step systems typically had diamond tread plate or a similar pattern called check pattern. It was customary in the industry to use this diamond tread to provide a nonslip surface. Noble testified that this diamond tread was the state of the art in 1963. It was also customary in the industry in 1963 to place the first step between 22 and 24 inches from the ground. A rounded edge to the step was also the custom and practice in the industry. Noble testified that such a gas tank step system was an appropriate and safe system for ingress and egress.

Noble testified that in 1963 there were no regulations relating to gas tank step systems. However, regulations existing at the time of trial required a maximum step height of 24 inches and a minimum step width of five inches. The gas tank step system from which plaintiff fell satisfies these requirements.

Noble inspected and measured the truck and gas tank step system from which plaintiff fell. The gas tank step system provides an appropriate three-point support system whether one is egressing facing forward or backward, and a grab handle is not necessary. Noble was unaware of any complaints or lawsuits received by Chrysler Corporation with respect to its similar ingress/egress system.

Defendant's third expert witness was Dr. James M. Miller, a professor of industrial and operations engineering at the University of Michigan, and an engineering consultant. Dr. Miller has a bachelor's degree in mechanical engineering, a master's degree in business administration and a Ph.D. in industrial engineering, specializing in human factors engineering and safety engineering in the transportation field.

Dr. Miller described a device which he and his staff had developed called a portable force platform. This portable force platform measures the forces placed upon it in three directions—vertically, horizontally and laterally. This force platform was used on the gas tank step from which plaintiff fell for the purpose of determining the force exerted by one stepping on the gas tank step. By stepping on the force platform in different ways, Dr. Miller was able to determine that it would require a coefficient of friction of only between .2 and .3 to prevent a slip on the step while egressing. Dr. Miller testified that if,

as testified to by plaintiff's expert, plaintiff's boot on the gas tank step had a coefficient of friction of .545, a slip would not be likely to occur with that boot on that surface. Dr. Miller opined that plaintiff did not slip off the gas tank step. Dr. Miller testified that based upon his measurements and tests, as well as those of Dr. Harrenstien, the gas tank step had adequate slip-resistancy and no defect in the gas tank step contributed to plaintiff's fall.

■ We find that the trial court's finding that defendant did not exercise due care in designing the gas tank step system is against the manifest weight of the evidence. While plaintiff's expert, Dr. Harrenstien, testified at great length as to the defects he found in the gas tank step system, his testimony did not serve to establish defendant's failure to exercise due care in the design of the gas tank step system. Dr. Harrenstien's testimony went largely to the condition of the product, rather than to the defendant's conduct in designing and manufacturing the product. To the extent Dr. Harrenstien's testimony did go to the issue of defendant's exercise of due care, it was sufficiently rebutted by defendant's three expert witnesses. Further, we find that the trial court gave undue weight to the testimony of Dr. Harrenstien while virtually ignoring the uncontroverted testimony of defendant's expert witnesses.

■ Dr. Harrenstien testified that he was not familiar with the custom and practice in the truck manufacturing industry with respect to gas tank step systems at the time the gas tank and truck were designed and manufactured. He testified that self-cleaning and alternative nonslip surfaces were available at that time; however, defendant's experts testified that such surfaces were not customarily used, while diamond tread plate was. While Dr. Harrenstien was able to testify as to what he believed to be inadequacies in the gas tank step system, and to suggest what he believed to be a better or safer system, such testimony is not conclusive on the issue of negligence. It has long been settled that it is not in itself negligence to supply a certain type of material which is reasonably safe and customarily used, though other materials might conceivably be safer. (*Watts v. Bacon & Van Buskirk Glass Co.* (1959), 18 Ill. 2d 226, 232, 163 N.E.2d 425, 428.) Under a theory of negligence, a manufacturer does not have a duty to provide the safest product, but only a reasonably safe product. Dr. Harrenstien's testimony did not establish defendant's failure to exercise reasonable care in designing the gas tank step system in question.

Further, the trial court placed undue weight upon Dr. Harrenstien's testimony. In reaching his conclusions as to negligence, Dr.

Harrenstien relied heavily on his knowledge of standards and specifications relating to stairways in buildings. We find that there is not sufficient similarity between stairways in buildings and gas tank step systems to warrant the giving of such weight to Dr. Harrenstien's opinions as was given by the trial court.

Defendant, on the other hand, presented a great deal of evidence with respect to the reasonableness of its conduct in designing and manufacturing the gas tank step system and truck in question, none of which was contradicted by Dr. Harrenstien. The trial court ignored this testimony, remarking in its order, "The defense called three engineering experts, however the only evidence which the court considers to be worth noting here came in during the cross-examination of Dr. Miller." That evidence was evidence which the court found to be impeaching of Dr. Miller's credibility.

■ It is well settled that, unless it is inherently unbelievable, uncontradicted testimony is not to be disregarded. (*Cosmopolitan National Bank v. County of Cook* (1984), 103 Ill. 2d 302, 315, 469 N.E.2d 183, 189.) There is nothing inherently unbelievable in the testimony of any of defendant's expert witnesses. Instead, we find them to be quite credible and further find that their testimony goes directly to the issue of negligence and defendant's exercise of due care. All three of defendant's experts had expertise in the design and manufacture of trucks, and Bolcer and Noble had been involved in that industry since before the design and manufacture of the gas tank step system and truck in question.

■ Bolcer and Noble were intimately familiar with what the custom and practice in the industry were with respect to gas tank step systems at the time of the design and manufacture of the system and truck in question. All of the major truck manufacturers offered a similar gas tank step system. Diamond tread was the custom in the industry, whereas the types of surfaces suggested by plaintiff's expert were not commonly used in the trucking industry. According to Noble, diamond tread was the state of the art in the industry at the time of the design and manufacture of the gas tank step system and truck in question. It was also customary in the industry to place the first step between 22 and 24 inches from the ground and to put a rounded edge on the step. While evidence of compliance with industry custom is not conclusive on the issue of exercise of due care, it is one of the circumstances to be considered, with other circumstances, in determining whether due care has been exercised. (*Denniston v. Skelly Oil Co.* (1977), 47 Ill. App. 3d 1054, 1068, 362 N.E.2d 712, 723.)

■ Bolcer and Noble testified to the testing and evaluation pro-

cedures utilized by defendant and other truck manufacturers during the relevant time period. Basically the same procedures were used by all of the major truck manufacturers at that time, and the procedures were very thorough and conscientious. Evidence of testing and evaluation procedures is also probative of the degree of care exercised by a defendant manufacturer. *Nave v. Rainbo Tire Service, Inc.* (1984), 123 Ill. App. 3d 585, 591-92, 462 N.E.2d 620, 625.

Defendant's experts also testified that, other than plaintiff's accident, they were unaware of any accidents or safety hazards involving defendant's or similar gas tank step systems from the time of the design and manufacture of the gas 'tank step system and truck in question.

█ We find that evidence of defendant's compliance with industry custom, together with evidence of its exhaustive testing and evaluation procedures for new truck designs, establishes that defendant exercised due care in designing and manufacturing the gas tank step system and truck in question.

██ We note that the trial court's findings of fact went only to the condition of the product; the trial court made no findings of fact with respect to defendant's conduct in designing and manufacturing the product. After finding that the gas tank step system was not reasonably safe, the trial court concluded that defendant knew, or in the exercise of ordinary care should have known, that it was not reasonably safe. However, the trial court made no findings of fact with respect to industry custom, state of the art, defendant's testing procedures or other evidence probative of due care to support this conclusion. The trial court seems to have blurred the distinction between strict products liability and negligence, and we reverse its finding of negligence as against the manifest weight of the evidence.

██ We further find that the trial court's finding that the negligent design of the gas tank step system was the cause in fact of plaintiff's fall is against the manifest weight of the evidence. A plaintiff who fails to establish the element of cause in fact has not sustained his burden of making a *prima facie* case in negligence. (*Morton v. F.B.D. Enterprises* (1986), 141 Ill. App. 3d 553, 560, 490 N.E.2d 995, 999.) Cause in fact cannot be established through surmise or conjecture, but is established only when there is a reasonable certainty that the defendant's conduct caused the injury. (*Morton,* 141 Ill. App. 3d at 560, 490 N.E.2d at 999.) In. *Morton,* this court reversed a jury's verdict in favor of plaintiff because there was insufficient evidence in the record of causation in fact. In that case, an individual fell down a step in defendant's establishment, striking

plaintiff and causing her to fall. The individual who fell testified that

"she believed she fell because the top step was too heavily carpeted. She expressly stated that the lighting presented no problem, that she had, indeed, seen the step on which she slipped. Although she testified that there was no handrail, she did not at any time indicate that an absence of such a railing contributed in any way to her fall. Nor did she indicate in any way that an inadequacy with regard to the wall, or guard, along the stairway had any bearing upon her fall." (*Morton*, 141 Ill. App. 3d at 560, 490 N.E.2d at 1000.)

This court found that there was insufficient evidence to link any conduct on the part of defendant to the individual's fall or to plaintiff's injuries.

Similarly, in the case at bar plaintiff was unable to say what caused his fall. He thought that his right foot might have hit the riser, but he was unsure. He was not sure if his left foot was firmly planted on the step and did not testify that his left foot slipped off of the step. There is no evidence that any of the defects in the gas tank step system testified to by Dr. Harrenstien actually caused or contributed to plaintiff's fall in any way. Plaintiff presented insufficient evidence to link his fall to any conduct on the part of defendant. As we pointed out above, cause in fact cannot be based on mere surmise or conjecture. The trial court's finding that the defendant's negligence was the cause in fact of plaintiff's injuries is against the manifest weight of the evidence.

■■■ We further find that the trial court erred in considering as evidence of causation an incident during cross-examination of plaintiff's expert in which defendant's counsel, Mr. McGlynn, slipped off of the gas tank step. The gas tank from which plaintiff fell had been removed from the truck and was sitting on the floor of the courtroom. Mr. McGlynn mounted the gas tank step as it sat on the floor and tried to position his foot and body in the same way Dr. Harrenstien had testified that plaintiff had been at the time of his fall. Mr. McGlynn's left foot slipped off the step and he began to fall. Mr. McGlynn explained that the fall was due to a recent surgery which he had had on his left calf muscle. The trial court referred to this as "an actual duplication of Cornstubble's dismount," and after discussing it, found that "the issue of proximate cause was established conclusively by the evidence adduced at trial."

We find that the trial court erred in considering Mr. McGlynn's fall as evidence of cause in fact of plaintiff's fall. Mr. McGlynn was not attempting to demonstrate or duplicate the precise way in which

plaintiff fell; he was merely attempting to clarify Dr. Harrenstien's testimony. Furthermore, the conditions under which plaintiff fell from the truck were quite different from those under which Mr. McGlynn fell from the gas tank. Mr. McGlynn's fall should not have been considered as substantive evidence, and for the trial court to rely on Mr. McGlynn's fall to establish the cause in fact of plaintiff's fall was clearly erroneous.

After careful review of the record and the law, we are compelled to reverse the findings of the trial court as to negligence and causation as against the manifest weight of the evidence. Where, as here, a cause is tried by a court without a jury and the parties have had the opportunity to present all their evidence, no new trial is required. (*Krug v. Machen* (1974), 24 Ill. App. 3d 526, 533, 321 N.E.2d 85, 91.) Instead, pursuant to the powers granted us by Supreme Court Rule 366 (107 Ill. 2d R. 366), we reverse the judgment of the trial court in favor of plaintiff-appellee and remand with directions that judgment be entered in favor of defendant-appellant. In light of this holding, we find it unnecessary to discuss defendant's third issue with respect to damages, or plaintiff's cross-appeal.

For the foregoing reasons, the judgment of the circuit court of St. Clair County is reversed and this cause is remanded with directions.

*Reversed and remanded with directions.*

LEWIS, J., concurs.

JUSTICE CALVO, dissenting:
After viewing the evidence in the light most favorable to plaintiff-appellee, I do not believe the findings of the trial court were against the manifest weight of the evidence, and therefore I would affirm the judgment of the trial court in favor of plaintiff.

The evidence at trial conflicted. In a bench trial, the trial court has the responsibility to determine the credibility of witnesses, to weigh the testimony, and to resolve conflicts in the evidence. (*MBL (USA) Corp. v. Diekman* (1983), 112 Ill. App. 3d 229, 235, 445 N.E.2d 418, 423.) Both parties presented evidence to support their respective positions. This court should not second-guess the trial court's determination of the factual issues in this case.

On the issue of negligence, plaintiff provided one expert, Harrenstien, and defendant provided three experts, Bolcer, Noble and Miller. The majority points out that Harrenstien did not have any ex-

perience or training in the field of automotive or truck design or manufacture, or in the design or manufacture of ingress/egress systems for trucks. In contrast, two of defendant's experts had education, training and experience specifically in the automotive and truck industry. Defendant, however, did not dispute on appeal that Harrenstien was qualified to be an expert witness. In fact, Harrenstien's educational background, combined with his experience and training in the design of stairways, ramps and ladders for ingress to and egress from buildings, would render him a qualified expert.

Once an expert has been qualified, the expert's background may be considered by the trier of fact in according weight to the expert's opinion. (*Ralston v. Plogger* (1985), 132 Ill. App. 3d 90, 98-99, 476 N.E.2d 1378, 1384.) Even though Bolcer and Noble qualified as expert witnesses, the trial court could have considered their opinions biased because of their extensive past employment with automobile and truck manufacturers. Bolcer had worked for Chrysler in the past, had worked for the defendant for 20 years, and at the time of trial was, in fact, still employed by the defendant. Noble worked for Chrysler for 30 years. Both men earned a degree of master of automotive engineering from the Chrysler Institute of Engineering. Consequently, neither Bolcer nor Noble could have rendered very objective opinions. The trial court could have accorded less weight to the testimony of Bolcer and Noble because of their employment in and probable bias toward the automotive and truck industry in general and toward the defendant in particular.

Plaintiff sufficiently impeached defendant's third expert witness, Miller, so that the trial court could have properly discounted Miller's testimony. Miller had the proper educational background to qualify him as an expert. Unlike Bolcer and Noble, Miller did not have any direct experience in the automotive or truck industry. Plaintiff, however, introduced into evidence a deposition which Miller had given in a pending Texas case, Patterson v. Ford Motor Company. Patterson involved a plaintiff injured in a dismount from the cab of a Ford truck. In Patterson, Miller testified *for plaintiff* and *against Ford*. Although the truck and step system in Patterson were not identical to those in the case at bar, Miller, in his deposition, rendered several of the same opinions regarding the step system as did Harrenstien in the case at bar. In order to prevent slippage, Miller recommended the use of a step with a sharp, rather than a rounded, edge; a three-point support system which did not involve a swinging door; and a system which allowed the ball of the foot to hit the step.

Plaintiff also introduced into evidence an article written by Miller

in 1976 which stated:

> "*Access/exits for trucks*. It has been estimated that about one-fourth of all driver injuries are associated with slips and falls in and around the tractor, and these injuries may be responsible for a large percentage of the permanent long-term disabilities, particularly with respect to back injuries. These falls seem to occur under three different types of tasks; the first is getting into and out of the cab itself just for the purposes of driving \*\*\*."

In this article, Miller also noted that the Bureau of Motor Carrier Safety recommended that ladders with larger steps, handholds and skid-free step surfaces would help reduce slip and fall accidents.

Furthermore, plaintiff introduced into evidence two very different resumes Miller had published. In the 1979 resume, Miller cited the consulting work he had performed concerning many different products, including a drop forge hammer and an ice edger machine. Miller did not list this consulting work in the resume he supplied to plaintiff. The trial court noted that Miller had a curious lapse of memory with regard to the prior cases in which he had testified; some of these cases he listed in the 1979 resume. The court also pointed out that Miller admitted testifying for Ford in February of 1986 in New Jersey with regard to a dismount injury from a Ford truck.

All of these prior opinions certainly rendered Miller's opinion in the case at bar less credible. Miller's testimony also reduced the strength of Bolcer's and Noble's testimony. Both Bolcer and Noble testified that they were unaware of any claims or lawsuits involving an ingress/egress system employing a gas tank step. While this specific gas tank step system and truck may not have been the subject of prior litigation, Miller's testimony rebutted the implication from Bolcer's and Noble's testimony that Ford had not previously participated in a dismount case, or that dismount accidents were infrequent. For the foregoing reasons, the trial court could have properly relied on Harrenstien's opinion over that of Bolcer, Noble and Miller.

As for the substance of Harrenstien's testimony, Harrenstien testified that defendant negligently designed the gas tank step system in eight ways. The trial court relied on six of Harrenstien's eight opinions—opinions two through seven—in order to establish defendant's negligence. The majority has already summarized these opinions, and the trial court thoroughly discussed these opinions at length in its order. I will not reiterate these opinions. Suffice it to say that I find no error with the trial court's analysis or decision

with regard to these six opinions. Harrenstien's opinions provided a sufficient basis on which to find defendant negligent. His opinions certainly conflicted with those of defendant's experts, but the trial court had the responsibility to judge the credibility of the witnesses and weigh the evidence.

The majority contends that while Harrenstien testified as to the defects he found in the gas tank step system, he failed to establish defendant's lack of due care in the design of said system. The majority points out that Harrenstien was not familiar with the custom and practice in the truck manufacturing industry with respect to gas tank step systems at the time Ford designed and manufactured the system and truck in question. The majority notes that Bolcer and Noble were familiar with industry custom. Bolcer and Noble testified that all of the major truck manufacturers used a similar gas tank step system, that diamond tread was the custom in the industry, and that the height and rounded edge of the step were also designed in accordance with industry custom. In addition, the majority asserts that Bolcer's and Noble's testimony with regard to the testing and evaluation procedures used by defendant also established defendant's due care.

The majority admits, however, that evidence of industry custom, and testing and evaluation procedures are not conclusive on the issue of negligence. (*Denniston v. Skelly Oil Co.* (1977), 47 Ill. App. 3d 1054, 1068, 362 N.E.2d 713, 723; see *Nave v. Rainbo Tire Service, Inc.* (1984), 123 Ill. App. 3d 585, 591-92, 462 N.E.2d 620, 625.) Such evidence is merely a factor to be considered when assessing whether a defendant has exercised due care. (*Denniston*, 47 Ill. App. 3d at 1068, 362 N.E.2d at 723; see *Nave*, 123 Ill. App. 3d at 591-92, 462 N.E.2d at 625.) Here again, the evidence conflicted. While Bolcer and Noble testified as to industry custom and testing procedures, Harrenstien testified that the gas tank step system was not reasonably safe and that reasonably safe design alternatives were available to defendant at the time Ford designed and manufactured the system. Harrenstien detailed the changes defendant could have undertaken in order to make the system reasonably safe. It is true that a manufacturer only has to provide a reasonably safe product and to exercise reasonable care in designing a product. The trial court, however, could have found that Ford did not exercise due care and that the gas tank step system was not reasonably safe. It was up to the trial court to remedy any conflict in the evidence.

The majority also asserts that although the court found that the system was unreasonably safe, it failed to make any findings with re-

spect to defendant's conduct in designing and manufacturing the system. The trial court did not discuss in its order defendant's testing procedures or the industry custom. Nevertheless, it did find that defendant knew, or in the exercise of ordinary care should have known, that the system was not reasonably safe. This finding means that the court determined that defendant did not exercise due care. The court stated that "[t]here was substantial evidence bearing on Ford's breach of duty, and on the fact that the breach caused the plaintiff to fall and sustain severe injury." The court spent a lengthy part of its order discussing Harrenstien's testimony, and it found that defendant, for six specific reasons and in six specific ways, did not exercise due care in designing the system. This finding did not mean the court did not consider Bolcer's and Noble's testimony. The court, in resolving the conflicting evidence, merely chose to elaborate on Harrenstien's opinions, because it relied on Harrenstien's opinions in finding defendant negligent. Contrary to the majority opinion, the trial court did not blur the distinction between strict products liability and negligence.

I also do not believe that the trial court's finding that the negligent design of the gas tank step system caused plaintiff's fall was against the manifest weight of the evidence. Plaintiff testified that as he got out of the truck his right foot hit the riser, and he fell and hit his upper and lower back in the fall. Moreover, Harrenstien testified that the design of the gas tank step system could have caused plaintiff's fall.

In addition, the trial court did not err in considering as evidence McGlynn's fall off the gas tank step during the demonstration at trial. McGlynn positioned himself exactly in the same way as plaintiff had been positioned at the time of plaintiff's fall. Although McGlynn's demonstration was certainly not conclusive proof of causation, the trial court could properly consider the demonstration. Of course, McGlynn could point out to the court that his recent surgery may have caused him to fall and that the circumstances between his fall and plaintiff's fall were different. Again, while McGlynn's demonstration was not conclusive on the issue of causation, it was one factor which the court could consider. Thus, the testimony of plaintiff and Harrenstien, combined with McGlynn's demonstration, provided a sufficient basis for the court to find that defendant's design of the gas tank step system was the cause in fact of plaintiff's fall.

The majority points out further that plaintiff could not exactly state what caused him to fall. Plaintiff did testify that he thought his right foot hit the riser as he tried to step down. Harrenstien testified

that the gas tank step system was negligently designed because it invited drivers to walk down the step as they would a stairway, and that from the cab, drivers could not discern that it had a closed riser upon which the drivers could hit their heel as they descended. Even if defendant presented conflicting evidence, however, the trial court had the responsibility to judge the credibility of the witness and weigh the conflicting evidence. Defendant spent a great deal of time during the trial attempting to impair the credibility of plaintiff and to find holes in his testimony. Defendant was entitled to do this to defend its case. Nevertheless, the trial court expressly found that plaintiff's testimony was credible and that it "had a clear understanding from the first day of trial how the accident occurred, and there was nothing in the evidence throughout the remainder of the trial which persuaded the court otherwise." The court then held that the testimony of plaintiff and Harrenstien, along with the demonstration by McGlynn, established causation. The court weighed the conflicting evidence and found in favor of plaintiff. Thus, the court did not base its decision on the issue of factual causation on speculation or conjecture. The evidence at trial provided the court with a reasonable certainty that defendant's conduct caused plaintiff's fall. The court could have reasonably concluded that the alleged defects in the defendant's design of the gas tank step system were substantial factors in bringing about plaintiff's accident, or that but for the defects, plaintiff's accident would not have occurred. (*Kerns v. Engelke* (1977), 54 Ill. App. 3d 323, 333, 369 N.E.2d 1284.) Therefore, the trial court's decision was not against the manifest weight of the evidence.

Because the majority did not render an opinion on the issue of damages or on plaintiff's cross-appeal, I likewise render no opinion on these two issues for purposes of this dissent.