SAMUEL L. YOUNG, Plaintiff-Appellee, v. THE CITY OF CEN-
TREVILLE *et al.*, Defendants-Appellants.

Fifth District No. 5—86—0697

Opinion filed May 3, 1988.

Donald W. Urban and Bernard J. Ysursa, both of Sprague, Sprague & Ysursa, of Belleville, for appellants.

Ripplinger & Dixon, of Belleville, for appellee.

PRESIDING JUSTICE HARRISON delivered the opinion of the court:

Plaintiff, Samuel L. Young, brought an action in the circuit court of St. Clair County to recover damages for injuries he sustained when he was shot in the back by Sylvester McWherter, assistant chief of the Centreville police department. Named as defendants were McWherter, the City of Centreville (City), and Theodore Shamalian, who was sued solely in his official capacity as Centreville's chief of police. Plaintiff sought recovery against each of these defendants pursuant to 42 U.S.C.A. section 1983 (West 1981). He also claimed that McWherter and the City of Centreville should be held liable under Illinois law for the tort of willful and wanton conduct.

Following a four-day trial, the jury entered verdicts in favor of plaintiff and against each of the defendants. On plaintiff's State law claim against McWherter and the City of Centreville, it awarded him no damages of any kind. On his section 1983 claims, it awarded him $5,000 in actual damages against Centreville, as well as $25,000 for the value of his lost constitutional rights. At the same time, it awarded no compensatory damages against either McWherter or Shamalian, but held that each of them was liable for $300 in punitive damages.

The circuit court entered judgment for plaintiff on these verdicts, and defendants promptly filed their post-trial motion. That motion was denied. At the same time, the circuit court awarded plaintiff attorney fees of $21,487.50 plus costs of $3,067.24. Defendants each now appeal. For the reasons which follow, we affirm the judgment as to liability, but reverse and remand for a new trial on the issue of damages.

■ Before addressing the merits of defendants' appeal, we feel constrained to observe that their brief does not comply with the requirements of Supreme Court Rule 341 (107 Ill. 2d R. 341). In particular, defendants have failed to include the introductory paragraph required by Rule 341(e)(2) and the statement of issues presented for review required by Rule 341(e)(3). We can find no justification for these omissions. Defendants' attorneys have appeared before this court on many occasions. They are expected to know and observe appellate procedure.

Adherence to Supreme Court Rule 341(e) (107 Ill. 2d R. 341) is not an inconsequential matter. The purpose of the rule is to require parties to proceedings before a reviewing court to present clear and orderly arguments so that the court may properly ascertain and dispose of the issues involved. (*47th & State Currency Exchange, Inc. v.*

*B. Coleman Corp.* (1977), 56 Ill. App. 3d 229, 232, 371 N.E.2d 294, 297.) Where an appellant's brief fails to comply with the rule, the appeal may be dismissed. (*Wilson v. Illinois Benedictine College* (1983), 112 Ill. App. 3d 932, 936, 445 N.E.2d 901, 909.) We do not believe that so severe a sanction is warranted here. Despite its deficiencies, defendants' brief is sufficient to enable us to discern defendants' arguments and to pass on the merits of their appeal. Nevertheless, we admonish counsel that future lapses in compliance will not be greeted so charitably.

The trial of this case commenced on February 18, 1986, but plaintiff was not present. Weeks earlier, defendants McWherter and Shamalian had learned that there were outstanding bench warrants against plaintiff for failure to pay fines in two traffic-related matters dating back to 1984. In an attempt to derail the proceedings, they kept this information to themselves until the eve of trial, when they called the St. Clair County sheriff's department and advised authorities there that plaintiff was scheduled to be in court the following morning. On his arrival at the courthouse that morning for the start of trial, plaintiff was met by a sheriff's deputy, who arrested him and took him into custody. The arrest was observed by Shamalian and McWherter, but they told no one about it, and plaintiff's whereabouts remained unknown until later in the day, when plaintiff was finally able to contact his attorney by telephone. Plaintiff was released from jail and was able to attend the proceedings the following day. At that time the trial judge advised the jury of defendants' aborted ploy, after which the parties presented their evidence.

That evidence, viewed in the light most favorable to plaintiff, the prevailing party (see *Renfro v. Allied Industrial Equipment Corp.* (1987), 155 Ill. App. 3d 140, 156, 507 N.E.2d 1213, 1227), showed that on Saturday morning, January 10, 1981, plaintiff was at the home of his mother, Neola Roddy, in Centreville, Illinois. Plaintiff had been out all night and had gone to his mother's to take a shower and change clothes. Shortly after 10 a.m., plaintiff decided that he might like a drink, but he did not want his mother to see him, so he stepped outside. While standing there, he observed an older-model Buick pull up to his mother's house. Five men got out. They had braided hair and wore cowboy hats. At least some of them were armed and had pistols drawn as they approached the house.

These were the "Donaby Brothers," a local gang. Fearful, plaintiff tried to flee on foot. He ran toward "Ridge Avenue," an unused railroad bed which divides Centreville from the City of East St. Louis, made a left turn onto 61st Street, then began "dodging" between

houses. At first he thought he would try to make it back to his mother's house, which is on 60th Street, but he decided instead to run down an alley toward State Street.

As plaintiff fled down the alley, his shoes became tangled in a discarded mattress which blocked the path. This was about three houses, or half of a block, from his mother's. As plaintiff attempted to extricate himself, he heard several bullets fly past his head and ankle. He then felt a round strike him in the back. The shot knocked him to the ground.

The person who wounded plaintiff was not one of the "Donaby Brothers," but defendant McWherter, assistant chief of the Centreville police. Unknown to plaintiff was that McWherter and defendant Shamalian, Centreville's chief of police, had driven up to his mother's house in an unmarked police car at the same time the Donabys had arrived. With McWherter and Shamalian in the car was David Brown, a suspect who had been arrested the previous day in connection with a burglary. While in jail, Brown allegedly implicated plaintiff in a series of burglaries, and Shamalian claimed that he and McWherter had gone to plaintiff's mother's house to arrest him for those burglaries.

Neither McWherter nor Shamalian was wearing a uniform, and McWherter did not identify himself as a police officer before opening fire on plaintiff. As plaintiff lay on the ground after being shot, he observed McWherter "creeping" toward him. He heard McWherter cock his pistol, apparently to shoot him again. Bernadette McCoy, who had just finished shopping at a nearby grocery store and rushed to the scene after hearing the shots, testified that she saw a person (McWherter) stand over plaintiff and that the person said to him, "I ought of [sic] killed you," or, "I ought to shoot you," or something to that effect. According to plaintiff, a friend of his saw what McWherter was about to do and told him, "Don't do that." A group of onlookers gathered. No further shots were fired.

When plaintiff was gunned down, he was actually in East St. Louis, not Centreville. Before medical help arrived, McWherter dragged plaintiff back to Ridge Avenue and the Centreville city limits. McWherter placed plaintiff face down on the ground, and David Brown, the burglary suspect, was brought over from the unmarked police car. According to plaintiff, McWherter asked Brown about a black and white television set, and Brown responded, "No, I didn't tell you that he had no T.V." Brown was then taken back, but instead of being placed in the unmarked police car, he was handed over to the Donaby Brothers. Plaintiff claimed that the Donaby Brothers then

took Brown to a house across the street and beat him up, but admitted that he did not personally witness the beating.

After 10 or 15 minutes, plaintiff was taken by ambulance to the Centreville Township Hospital. Dr. Charles Frazier, who treated him, testified that McWherter's bullet had "entered through the back of plaintiff's right shoulder, fracturing his scapula, and lodged in his chest, a couple of inches to the right of the breast bone, in the region of the second rib." Plaintiff remained hospitalized for about a week. The bullet has yet to be removed, although Dr. Frazier stated that it could be extracted at any time with little difficulty and without the need for further hospitalization.

Although Shamalian and McWherter claimed that they went looking for plaintiff on the morning of January 10 as part of a burglary investigation, there is no dispute that they never sought or obtained a warrant for plaintiff's arrest before tracking him down. Plaintiff was not convicted, tried, or even charged with burglary. David Brown, the burglary suspect, was not called by defendants and therefore could not corroborate their story.

■ When McWherter shot plaintiff in the back, the Centreville police had a policy which authorized its officers to use deadly force to protect themselves or others or to stop an escaping felon. The United States Supreme Court has held, however, that to use deadly force to stop a fleeing suspect merely because that suspect may have committed some type of felony is constitutionally unreasonable. Under the fourth amendment, deadly force may be used to prevent escape only if the officer has probable cause to believe that the suspect poses a serious threat of harm, either to the officer or others. (*Tennessee v. Garner* (1985), 471 U.S. 1, 11, 85 L. Ed. 2d 1, 9-10, 105 S. Ct. 1694, 1701.)

> "Thus, if the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given." 471 U.S. 1, 11-12, 85 L. Ed. 2d 1, 10, 105 S. Ct. 1694, 1701.

Even if, *arguendo*, the police did have probable cause to believe that plaintiff had been involved in the commission of a burglary here, they would not have had grounds to use deadly force against him under this standard, for no claim has been made that the burglary or burglaries in which plaintiff was implicated involved the infliction or threatened infliction of serious physical harm. McWherter did assert

that he had been told by Brown, the informant, that plaintiff had a .38 caliber pistol and that he thought plaintiff was reaching for that pistol to shoot him during the course of the chase. The jury, however, apparently found this story to be untrue.

During plaintiff's case, McWherter himself admitted that he never saw a gun in plaintiff's possession and that no gun was found at the scene. As we have noted, Brown, the informant, was not called by defendants, and the only corroboration for the claim that plaintiff might be armed came from defendants themselves. The testimony presented by and on behalf of defendants was, however, fraught with contradiction and inconsistencies.

The police report filed after the shooting apparently indicated that plaintiff was not shot by McWherter at all, but by defendant Shamalian. At trial, Shamalian stated that it was McWherter who fired at plaintiff. While McWherter allegedly feared that plaintiff might start shooting, Shamalian, who was standing close to McWherter at the time, did not even remove his own sidearm from its holster. He admitted that he did not find it necessary to protect himself.

When he was before the jury, McWherter testified that he yelled "Halt, police" twice, at which time plaintiff turned toward him and put his right hand into his waistband. McWherter then fired two warning shots in the air and leveled his pistol at plaintiff. As plaintiff turned away from him, he fired a third time, hitting plaintiff in the shoulder. At his deposition, McWherter told a different story. In that deposition, McWherter suggested that some other police officer had told plaintiff to halt and that he did not fire the warning shots until plaintiff turned to run again. According to McWherter's deposition testimony, plaintiff then placed his hand in his jacket, not his waistband. He turned back toward McWherter a second time, and only then did McWherter fire the wounding shot.

There were other inconsistencies in defendants' evidence as well. Defendant Shamalian testified at his deposition that upon arriving on the scene the morning of the shooting, he parked the unmarked police car in which he, McWherter, and Brown were riding on 61st Street. At trial, he initially stated that he was actually parked on 60th Street. Later he indicated that he parked on Ridge Avenue at 60th Street.

Larry Wynn, an East St. Louis police officer who was called to the scene just before plaintiff was shot, also testified on behalf of defendants. According to Wynn, he did not witness the shooting itself, but after the shots were fired he saw plaintiff raise his hands as if to give up and then walk with McWherter back to Ridge Avenue. How plaintiff could have raised both hands in the air, given that one of his

shoulder blades was fractured by McWherter's bullet, is a problem which Wynn apparently did not stop to consider. In any case, not even McWherter claimed that this had happened. According to McWherter, plaintiff ran about five feet and then lay down after being shot. McWherter went up to him, told him "to keep his hand in plain sight," conducted a field search, then held him up and walked him back to Ridge Avenue, where he was allowed to lie down until the ambulance arrived.

Shamalian, who has been chief of Centreville's police department for 25 years, stated at trial that he is responsible for implementing department policy. He testified that the department has no written policy requiring a firearms review, a firearms discharge report, or an internal affairs investigation when a citizen is shot and that no such reviews, reports, or investigations were made in this case. Shamalian further testified that McWherter was not disciplined for shooting plaintiff. Since the shooting, McWherter has actually been promoted by the department.

According to Shamalian, most training for Centreville's police officers is conducted by the department itself. McWherter claimed that he had received firearms training sometime in 1980, prior to the shooting, but such training was not reflected in his personnel records. While Shamalian indicated that the department maintained a separate firearms training log, defendants were unable to adduce any documentary evidence, including copies of the log, showing that McWherter had ever been trained in the use of firearms at the time he shot plaintiff.

Noah Goddard, a criminologist and former police officer, was called as an expert witness by plaintiff. In Goddard's opinion, McWherter violated accepted police standards when he shot plaintiff in the back because plaintiff "was no threat to the officer whatsoever." Goddard also stated that McWherter should not have fired warning shots, as he is claimed by defendants to have done. According to Goddard, firing warning shots does not meet acceptable police standards for several reasons. First, it wastes ammunition which the officer may need later to defend himself. Second, it may prompt a suspect who is armed to return fire. Third, it may cause other officers in the area who cannot see the "shooter officer" and do not know who fired the shots to discharge their weapons needlessly. Finally, warning shots may pose a threat to innocent members of the public who may be in the area, such as the bystanders who came to the scene here to see what had happened.

According to Goddard, accepted police procedure calls for a de-

partment to conduct an internal investigation whenever a police officer shoots a citizen. Such investigations are necessary in order to review department policies and procedures and ascertain whether manpower was correctly deployed and whether appropriate action was taken. As we have noted, no internal investigation was undertaken here. Goddard further stated that the Centreville police department failed to conform to accepted police standards when it did not take a shell count or complete a discharge of firearms report following the shooting. Goddard explained on cross-examination that lack of investigation following the shooting was indicative of a lack of management in the department. He added that if such matters are not investigated, "it sends a clear message that they aren't important."

In Goddard's view, the Centreville police department's firearms policy was deficient for, among other reasons, failing to provide any real guidelines for police officers as to when deadly force should be used. He stated that other alternatives could have been followed in this case to apprehend plaintiff, including the use of additional manpower, and that the deficiencies in Centreville's police policies as set forth above were responsible for causing plaintiff's injuries.

Just as he criticized department policy, Goddard faulted defendant Shamalian, as manager of the department, for using that policy. In addition, Goddard testified that accepted police procedure calls for quarterly practice by police officers on a firing range and retraining at least every six months. He noted that McWherter's personnel file reflected no such practice or training and stated that under accepted police practice, training records should be kept in an officer's personnel file to aid in evaluation, planning, revision of policy, and managing the department. In Goddard's opinion, Centreville did not have a program for training in the use of deadly force which met accepted police standards and the inadequate training of McWherter was also a cause of plaintiff's injuries.

As submitted to the jury, plaintiff's complaint contained four counts. Count I sought recovery against McWherter based on the common law tort of willful and wanton conduct. It further claimed that defendant the City of Centreville should be held liable for McWherter's conduct under the theory of *respondeat superior*. On this claim, plaintiff sought only compensatory damages.

Count II, also directed against McWherter, was brought pursuant to 42 U.S.C.A. section 1983 (West 1981) and alleged that while acting under color of State law, McWherter deprived him of his constitutional right "to be free from the use of excessive force against his person during the course of an arrest." Under this count, plaintiff

sought not only compensatory damages, but also punitive damages and damages for

> "[t]he reasonable value of the right and privilege secured and protected to him by the Constitution and Laws of the United States, namely the Constitutional right not to be unreasonably subjected to deadly force against his person during the course of being questioned, detained, or otherwise taken into custody."

In count III, plaintiff sought recovery under 42 U.S.C.A. section 1983 (West 1981) against the City of Centreville. As grounds for this claim, plaintiff alleged that the City was liable for deprivation of his constitutional rights and the consequent physical injuries he sustained when McWherter shot him, because McWherter's conduct was the result of a municipal policy, custom or usage. Specifically, plaintiff asserted that he was injured because the City had no internal shooting review process and no policy of investigation of civilian shootings; that the City had a policy to use unjustified, unnecessary and excessive force in questioning, detaining, or otherwise taking individuals into custody; and that McWherter had not been properly supervised, directed, or trained in the use of firearms and in the use of deadly force when questioning, detaining, or otherwise taking individuals into custody. On this count, plaintiff prayed for compensatory damages and damages for the reasonable value of the constitutional right the City is alleged to have violated.

Count IV was directed against defendant Shamalian in his official capacity as chief of police pursuant to 42 U.S.C.A. section 1983 (West 1981). The theory of recovery under this count was that Shamalian should be held liable in his official capacity for violation of plaintiff's constitutional right to be free from the use of excessive force while being questioned, detained or otherwise taken into custody because that constitutional deprivation was caused by Shamalian's failure to properly train or supervise McWherter. Plaintiff further claimed that Shamalian had acted maliciously, wantonly and oppressively. As under count II, plaintiff sought both compensatory and punitive damages, as well as damages for the reasonable value of the constitutional right Shamalian is alleged to have violated.

As noted at the outset of this opinion, the jury found in favor of plaintiff and against defendants on all counts. Its assessment of damages was not so uniform. On count I, the jury awarded plaintiff nothing. On count II, it assessed only punitive damages. These were set at $300. On count III, it awarded plaintiff $5,000 in compensatory damages and $25,000 for the reasonable value of plaintiff's constitutional right. In count IV as in count II, it awarded plaintiff only $300 in pu-

nitive damages. The trial court entered judgment for plaintiff on these verdicts, and defendants filed a post-trial motion to have the judgment set aside. Plaintiff, for his part, filed a motion pursuant to 42 U.S.C.A. section 1988 (West 1981) requesting an award of his reasonable costs and attorney fees as the "prevailing party." Defendants' post-trial motion was denied. Plaintiff's motion was granted, and he was awarded attorney fees of $21,487.50 and costs of $3,067.24.

■ On this appeal, defendants first argue that the circuit court erred in granting certain motions *in limine* filed by plaintiff at the outset of trial. This court has recently held that a motion *in limine* should be employed with caution because it may unduly restrict the opposing party's presentation of its case. (*Burris v. Madison County* (1987), 154 Ill. App. 3d 1064, 1070, 507 N.E.2d 1267, 1271.) Here, defendants claim that the circuit court's rulings did precisely that. The problem with defendants' argument is that they fail to explain how, in particular, presentation of their case was hampered. The most they can say is that the granting of plaintiff's motions *in limine* had a "chilling effect on the strategy of the defense." This is scarcely an adequate basis for reversing the judgment.

Error in the exclusion or admission of evidence does not require reversal where there has been no prejudice or where the result of the trial has not been materially affected. (*Ford v. City of Chicago* (1985), 132 Ill. App. 3d 408, 414, 476 N.E.2d 1232, 1237.) The contested motions *in limine* here sought to exclude, among other things, reference to prior arrests and convictions plaintiff may have had, testimony that plaintiff was drinking and smoking marijuana just before he was shot, and statements from McWherter and Shamalian as to what David Brown, their informant, had told them about plaintiff. As our review of the record has suggested, much of this evidence was ultimately presented to the jury. To this extent, the circuit court's decision to grant plaintiff's motions *in limine* can hardly be said to have prejudiced defendants. As for plaintiff's alleged prior criminal history and his use of marijuana on the morning of the shooting, defendants' counsel made no offer of proof, formal or otherwise, regarding these matters. As a result, there is no basis for determining what the evidence would have shown. We therefore cannot say that the circuit court committed reversible error in excluding that evidence. Indeed, given the absence of an adequate offer of proof, we deem this claim of error to have been waived. *Mulhern v. Talk of the Town, Inc.* (1985), 138 Ill. App. 3d 829, 834, 486 N.E.2d 383, 387.

■ A second argument raised by defendants is that the jury's verdicts were against the manifest weight of the evidence. In support

of this claim, defendants argue simply that the "testimony of the plaintiff was contradictory and direct conflict [*sic*] with the testimony of the officers," and that the plaintiff's expert testimony was given on the basis of evidence presented solely in the plaintiff's portion of the proceeding and before he had had an opportunity to hear the testimony presented by defendants during their case. It is axiomatic, however, that a jury's verdict cannot be set aside merely because there is conflicting evidence on factual questions. (*McMahon v. Richard Gorazd, Inc.* (1985), 135 Ill. App. 3d 211, 221, 481 N.E.2d 787, 794.) Similarly a jury's verdict should not be set aside merely because the jury could have drawn different inferences and conclusions from such conflicting testimony. (*Friedland v. Allis Chalmers Co.* (1987), 159 Ill. App. 3d 1, 9, 511 N.E.2d 1199, 1205.) Only if the verdict is palpably erroneous and wholly unwarranted, is clearly the result of passion or prejudice or appears to be arbitrary, unreasonable, and not based upon the evidence will it be overturned. 159 Ill. App. 3d at 9, 511 N.E.2d at 1205.

This is not such a case. According to the evidence, defendants' firearms policy provided that "it is better to be judged by twelve than carried by six." Defendants acted in accordance with this credo when they shot plaintiff, and the jury of 12 which they desired has passed its judgment on their actions. We have not found, and defendants have not cited, any legitimate basis for disturbing the jury's finding that defendants should now be held liable.

■ Defendants next argue that the circuit court erred in submitting to the jury plaintiff's tendered instruction No. 23. That instruction, relating to count IV of plaintiff's complaint, set forth, among other things, the elements necessary to find defendant Shamalian liable to plaintiff in his official capacity as chief of Centreville's police department. Without addressing the merits of defendants' argument, we note simply that defendants' attorney did not object to this instruction at trial. Because no such objection was raised, any error in submitting the instruction to the jury has not been properly preserved for review and shall not be considered by this court. *Burge v. Morton* (1981), 99 Ill. App. 3d 266, 268, 425 N.E.2d 539, 541.

A fourth, and more substantial, argument made by defendants is that the jury's verdicts must be set aside because they are inconsistent with one another. With respect to the jury's findings as to liability, this claim has no merit. On all counts and as to each defendant, the jury uniformly ruled in favor of plaintiff. Its damage awards, by contrast, were not so consistent.

■ We recognize that verdicts are to be liberally construed

(*Churchill v. Norfolk & Western Ry. Co.* (1978), 73 Ill. 2d 127, 148, 383 N.E.2d 929, 938) and that defects in them can be corrected whenever the intention of the jury is clear (*Anderson v. Smith* (1980), 91 Ill. App. 3d 938, 940, 415 N.E.2d 643, 646). At the same time, "the same jury on a single set of facts and circumstances cannot reach two different conclusions of facts as expressed in their verdicts that will support valid judgments unless those opposite, inconsistent conclusions are reconcilable under an applicable rule of law." *Boasiako v. Checker Taxi Co.* (1986), 140 Ill. App. 3d 210, 212-13, 488 N.E.2d 672, 674.

■■ In this case counts I and III were, as we have noted, directed against the City of Centreville, as well as McWherter. Count IV named defendant Shamalian in his "official capacity," but a judgment against a public servant in his official capacity imposes liability on the entity that he represents. (*Brandon v. Holt* (1985), 469 U.S. 464, 471-72, 83 L. Ed. 2d 878, 885, 105 S. Ct. 873, 878, cited in *Strandell v. Jackson County* (S.D. Ill. 1986), 648 F. Supp. 126, 134.) Thus, the City of Centreville was the actual defendant in count IV as well. The theories of recovery underlying each of these three counts differed, but the compensatory damages requested were the same. Thus, since the jury found the city liable under each of these three counts, it should have awarded the same amount of compensatory damages under each, and it was instructed to do so at trial. Instead, it awarded compensatory damages only on count III.

A similar inconsistency arises in the verdicts against the city and. McWherter. The actual damages sustained by plaintiff and requested by him in his complaint against McWherter were identical to those in his complaint against the city. While the elements necessary to hold these two defendants liable differed, the compensatory damages flowing from their wrongdoing did not. Once again, therefore, when the jury found both McWherter and the city liable, as it did, it should have assessed the same amount of compensatory damages against each. McWherter, however, was found to owe only $300 in punitive damages.

One might argue that when the jury awarded compensatory damages against the city on only one of the three counts, its intention was merely to say that the city should not have to pay more than $5,000 in compensatory damages overall, having misunderstood that plaintiff would not be able to recover three different times for the same damages. We cannot, however, divine what the jury intended in treating the claims against McWherter and the city so differently. We do not know, and plaintiff has not cited, any applicable rule of law un-

der which these verdicts can be reconciled. Those verdicts are legally inconsistent and must therefore be set aside. See *Wottowa Insurance Agency, Inc. v. Bock* (1984), 104 Ill. 2d 311, 316, 472 N.E.2d 411, 413.

■ Defendants argue that because the verdicts are legally inconsistent a new trial should be ordered as to all issues. We disagree. A new trial limited to the issue of damages may be granted where the damage issue is so separable and distinct from the issue of liability that a trial solely on that issue may be had without injustice. (*Gall v. Metropolitan Sanitary District* (1982), 109 Ill. App. 3d 502, 511, 440 N.E.2d 973, 980.) We believe this to be such a case.

■ Defendants raise various other challenges to the damages awarded by the jury. In light of our decision that a new trial must be held on the issue of damages, resolution of most of these claims has become unnecessary. There is one exception. At trial, the jury compensated plaintiff for the reasonable value of the constitutional right not to be unreasonably subjected to deadly force during the course of being questioned, detained, or otherwise taken into custody. These damages amounted to $25,000. They were given in addition to the compensatory damages received by plaintiff for his actual injuries according to ordinary tort loss standards and were based on the jury's subjective perception of the value or importance of the constitutional right involved. These damages should not have been awarded. Under *Carey v. Piphus* (1978), 435 U.S. 247, 55 L. Ed. 2d 252, 98 S. Ct. 1042, damages based on the abstract value or importance of constitutional rights are not a permissible element of compensatory damages in actions brought pursuant to 42 U.S.C.A. section 1983 (West 1981). *Memphis Community School District v. Stachura* (1986), 477 U.S. 299, 91 L. Ed. 2d 249, 261, 106 S. Ct. 2537, 2545.

Plaintiff points out that defendants did not object to his request for such damages at trial. If we were affirming this case outright, we might agree that defendants had waived the objection. Because this case must be remanded for a new trial on damages, however, we can see no purpose which would be served by allowing this error to be perpetuated.

Plaintiff has filed a motion, which we have taken with the case, to strike two arguments from defendants' brief: (1) that the trial court should have granted defendants' post-trial motion following the United States Supreme Court's ruling in *Memphis Community School District v. Stachura* (1986), 477 U.S. 299, 91 L. Ed. 2d 249, 106 S. Ct. 2537, and (2) that the jury was improperly instructed as to the liability of defendant Shamalian. In light of our disposition of defendants' appeal, further action by this court on that motion has become unnecessary.

 Although defendants' notice of appeal indicated that they were also challenging the circuit court's award of attorney fees and costs to plaintiff, no argument has been raised regarding the propriety of that award. Although we must vacate that portion of the circuit court's judgment dealing with the award of damages, plaintiff remains the "prevailing party" within the meaning of 42 U.S.C.A. section 1988 (West 1981), and his fee award shall not be disturbed.

For the foregoing reasons, the judgment of the circuit court of St. Clair County is affirmed in part and reversed in part, and plaintiff's cause is remanded for a new trial limited solely to the issue of damages.

Affirmed in part; reversed in part and remanded for a new trial on the issue of damages only.

LEWIS and CALVO, JJ., concur.