VIVIAN VAUGHN, Adm'x of the Estate of George Vaughn, Deceased, Plaintiff-Appellee, v. GRANITE CITY STEEL DIVISION OF NATIONAL STEEL CORPORATION, Defendant-Appellant.

Fifth District   No. 5—89—0517

Opinion filed May 8, 1991.—Rehearing denied August 22, 1991.

48

HARRISON, J., dissenting.

Churchill & McDonnell, of Belleville (Joseph B. McDonnell, of counsel), for appellant.

George J. Moran, Sr., John Long, and Harry J. Sterling, all of Troy, for appellee.

JUSTICE GOLDENHERSH delivered the opinion of the court:
Plaintiff, Vivian Vaughn, as administratrix of the estate of George Vaughn, deceased, brought an action in the circuit court of Madison County to recover damages from defendant, Granite City Steel Division of National Steel Corporation, under the Wrongful Death Act (the Act) (Ill. Rev. Stat. 1983, ch. 70, par. 1 *et seq.*). Following a jury trial, a verdict was returned in favor of plaintiff in the amount of $415,000. The circuit court entered judgment on that verdict and denied defendant's post-trial motion. Defendant now appeals. We affirm.

The evidence presented to the jury established that the decedent, George Vaughn, was employed by defendant as a hod carrier. Shortly before midnight on May 5, 1981, the decedent's body was found lying next to his automobile in a parking lot provided by defendant for the use of its employees. The lot was one of several owned and maintained by defendant at its steel mill in Granite City. This particular lot was commonly referred to as the Nash Street lot.

Investigation revealed that the decedent had died of gunshot wounds shortly before his body was discovered. One wound was found in his head and another in his abdomen. Gunpowder burns were present around the abdominal wound, indicating that the shot had

been fired at close range, and a discharged round was found near the scene. The decedent's glasses and hat were lying near his body. A paper sack was found between his legs. The sack had a hole in it and bore powder burns. In addition, handguns and ammunition were recovered from the decedent's automobile, and $71.21 in cash and a silver wristwatch were found on his body. There were no witnesses to the incident, no suspects were ever arrested, and one of the decedent's friends and co-workers testified that he knew of no one who would have had any reason to kill the decedent.

There is no dispute that the gunshot wounds which killed the decedent were not self-inflicted. The decedent was, almost certainly, the victim of a homicide which took place as he was about to report for work. The evidence established that the decedent was the first and only person ever to have been shot on defendant's parking lot. No acts of personal violence of any kind had taken place there before. There were previously reported incidents of crimes against property.

Plaintiff submitted to the court defendant's index of the incident reports compiled by defendant's plant protection department concerning incidents which had occurred on defendant's parking lots. Plaintiff also submitted to the court 20 of the incident reports, concerning incidents on the Nash Street parking lot, which were summarized in the index. All these reports concerned incidents that had occurred on the Nash Street parking lot within two years prior to the death of the decedent, as required by an earlier *in limine* ruling by the court which limited previous incidents to those involving theft, vandalism, and acts against persons on the Nash Street lot. The 20 reports concerned the following criminal incidents on the Nash Street parking lot: a stolen vehicle on October 10, 1979; a stolen vehicle on January 10, 1980; a stolen vehicle on January 11, 1980; an attempted theft of a vehicle on July 30, 1979; and a series of burglaries and attempted burglaries from automobiles parked on the Nash Street parking lot, the last of which occurred on April 21, 1981, two weeks before plaintiff's decedent was shot. In another incident, which occurred on September 12, 1979, defendant's security guard, Russell Wineburner, confronted, and drew his gun on, two men who were on the Nash Street parking lot, one of whom was carrying a large pry bar.

In his cross-examination of defendant's security expert witness, David Smith, plaintiff's attorney suggested measures that defendant had not taken, but could have taken, to minimize the risk of a criminal attack upon an employee on the Nash Street parking lot, such as erecting fences around the lot to control access to the lot, placing a guard in an elevated station to survey the lot, placing the guard on

the lot at the time of shift changes, and lighting the lot well. Plaintiff's attorney then inquired of defendant's security expert witness whether defendant could have done those things and thereby have minimized the risk of harm to plaintiff's decedent. The witness replied, "I believe so, yes."

As indicated at the outset of this opinion, plaintiff sought to impose liability on defendant for the decedent's death pursuant to the Act (Ill. Rev. Stat. 1983, ch. 70, par. 1 *et seq.*). The essential elements of recovery under that statute include a duty of defendant toward the decedent, a breach of that duty, and pecuniary damages resulting therefrom to persons designated by the Act. *Old Second National Bank v. Aurora Township* (1987), 156 Ill. App. 3d 62, 65, 509 N.E.2d 692, 695.

A threshold problem with plaintiff's cause of action concerned the first of these elements, the existence of a duty. Despite the paucity of evidence surrounding the circumstances of the decedent's death, and despite the fact that not all homicide is unlawful (see Ill. Rev. Stat. 1983, ch. 38, par. 7—1 *et seq.*), plaintiff theorized that the fatal assault on the decedent was criminal in nature. Plaintiff argued that a duty existed here because (1) there was a special relation between defendant and the decedent, that of employer and employee, and (2) the allegedly criminal conduct which took the decedent's life was reasonably foreseeable in light of the various property-related crimes which had previously taken place on defendant's parking lots.

In her complaint and in her arguments to the jury, plaintiff also asserted that defendant had a duty to protect the decedent against the criminal conduct of third persons because of a voluntary contractual undertaking by defendant. In support of this claim, plaintiff cited a written agreement between defendant and the United Steelworkers of America on behalf of Local Union 4063, which represented the steel mill's security guard force. That agreement provided, in part, that "[t]he Union recognizes that it is the responsibility of the Plant Guard to guard and protect the employees and their property while on plant property."

Plaintiff further cited the standard operating procedures of defendant's "plant protection department," which stated that the objectives of the employees of that department were, among other things:

> "To maintain the peace and protect all employees and their property while they are on the Company's premises.
>
> To deny access to all persons not specifically authorized or properly invited.

> To provide a readily available trained and responsive force to function in emergencies."

Plaintiff's theory was that, to perform the duty it had undertaken by virtue of these documents, defendant was obligated to use reasonable care to anticipate and to protect the decedent from criminal activity by third persons while the decedent was on defendant's parking lot.

According to plaintiff, defendant breached its duty to provide protection in one or more of the following ways:

(1) by failing to furnish proper security lighting on the parking lot, thus making it more likely that a violent crime would be committed; or

(2) by failing to furnish proper security lighting on the parking lot, which lighting would have permitted observation of the attacker by the decedent or by the security force; or

(3) by failing to provide a sufficient security force to protect the decedent from harm while he was using the parking lot; or

(4) by failing to take sufficient steps to deny access to persons not authorized or invited to be on the parking lot; or

(5) by decreasing the security of the decedent by taking the handguns away from the guards who guarded the entrance gates to the plant.

According to plaintiff, one or more of the foregoing factors was the proximate cause of the decedent's death, and as a result of the decedent's death, the decedent's widow and his three children sustained damage.

The jury ultimately accepted plaintiff's argument and entered a verdict in her favor in the amount of $415,000. The circuit court entered judgment on that verdict and denied defendant's post-trial motion. Defendant has now appealed, and as grounds for its appeal it contends: (1) that the circuit court erred in not entering judgment notwithstanding the verdict, or in the alternative, (2) that the circuit court should have granted defendant a new trial because the verdict was against the manifest weight of the evidence, because the court erred in certain rulings on the admission and exclusion of evidence, and because the court committed reversible error in instructing the jury. Defendant also asserts that the judgment should have been set aside and the complaint dismissed with prejudice because plaintiff's complaint failed even to state a cause of action. We shall begin our discussion with the first of these issues, denial of defendant's motion for judgment notwithstanding the verdict.

■ It is axiomatic that a motion for judgment notwithstanding the verdict should be granted only in those cases where all of the evi-

dence, when viewed in the light most favorable to the party opposing the motion, so overwhelmingly favors the movant that no contrary verdict based on that evidence could ever stand. *Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 229 N.E.2d 504.

■ In this case, defendant argues, *inter alia*, that its motion should have been granted because it did not, in fact, owe any legally cognizable duty to the decedent. Although both parties have devoted a considerable amount of their argument to this issue, we found this particular issue to be decided without difficulty because defendant voluntarily undertook the task of protecting its employees while on defendant's property, including the parking lots.

Defendant is correct that a plaintiff cannot recover in tort for negligence unless the defendant has breached a duty owed to the plaintiff. (*Boyd v. Racine Currency Exchange, Inc.* (1973), 56 Ill. 2d 95, 97, 306 N.E.2d 39, 40.) The law is also clear that liability can arise from the negligent performance of a voluntary undertaking. (*Nelson v. Union Wire Rope Corp.* (1964), 31 Ill. 2d 69, 74, 199 N.E.2d 769, 773.) Applying this principle, our supreme court in *Pippin v. Chicago Housing Authority* (1979), 78 Ill. 2d 204, 399 N.E.2d 596, held that the defendant's liability on an assumed duty theory is limited by the extent of his undertaking. The holding in *Pippin* reflected section 324A of the Restatement (Second) of Torts, which states:

> "One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if
>
> (a) his failure to exercise reasonable care increases the risk of such harm, or
>
> (b) he has undertaken to perform a duty owed by the other to the third person, or
>
> (c) the harm is suffered because of reliance of the other or the third person upon the undertaking." Restatement (Second) of Torts §324A, at 142 (1965).

As noted in *Pippin*, the rationale for subsection (c) is expressed in the Restatement comments:

> "Where the reliance of the other, or of the third person, has induced him to forgo other remedies or precautions against such a risk, the harm results from the negligence as fully as if the actor had created the risk." (Restatement (Second) of Torts §324A, Comment *e*, at 144 (1965).)

(*Pippin v. Chicago Housing Authority* (1979), 78 Ill. 2d 204, 211, 399 N.E.2d 596, 600; see also *Scott & Fetzer Co. v. Montgomery Ward & Co.* (1986), 112 Ill. 2d 378, 390, 493 N.E.2d 1022, 1027.) The *Pippin* court found that the defendant voluntarily engaged a private security guard service, but since the defendant had assumed only the duty of hiring the service, the defendant's duty to the plaintiff was limited to using reasonable care in hiring the security firm. *Pippin*, 78 Ill. 2d at 210, 399 N.E.2d at 599.

In *Kraustrunk v. Chicago Housing Authority* (1987), 95 Ill. App. 3d 529, 420 N.E.2d 429, our colleagues on the First District Appellate Court found that even if an agreement between the housing authority and the local police to increase patrols at a certain housing project amounted to a voluntary undertaking to secure additional protective services, the allegations in the plaintiff's complaint failed to state a cause of action. In *Kraustrunk*, the plaintiff was an elevator repairman who was attacked at the housing project where additional patrols were to be placed by agreement of the housing authority and local police. The *Kraustrunk* court found that the plaintiff's complaint set out no facts that would lead to the conclusion that either the housing authority or the police actually increased the risk of attack. While the *Kraustrunk* court found that the plaintiff's complaint failed to state a cause of action, it nevertheless also found that a duty can arise from a voluntary undertaking under the proper set of facts. Applying this principle to the facts at bar, we find that defendant did have a duty to protect plaintiff.

■■ A company-initiated manual, to which the union agreed, entitled "Standard Operating Procedures, Plant Protection Department, Granite City Steel," was in effect at the time of the decedent's death. The plant protection department consisted of the members of the security guard's local and their supervisors. Under the "objectives" portion of the manual, the following statement of goals was listed:

"— To protect the property of the Company against all acts which would tend to deny the Company the use of said property.

— To maintain the peace and protect all employees and their property while they are on the Company's premises.

— To deny access to all persons not specifically authorized or properly invited.

— To provide a readily available, trained, and responsive force to function in emergencies."

From this language it is clear that it was the intention of defendant to protect its employees while the employees were on its premises and

to keep unauthorized individuals off its property and to this end to hire a guard force to perform such duties.

A labor contract between defendant and Local Union No. 4063, the plant guard force, was also in effect at the time of the decedent's death. It included the following language under a provision entitled "Responsibility":

> "The Union recognizes that it is the responsibility of the Plant Guards to guard and protect the employees and their property while on plant property; and to guard and protect the plants, premises, materials, facilities and the property of the company at all times and under all circumstances."

Because defendant voluntarily chose to undertake the responsibility to perform its own guard services, defendant can be held liable if it can be found that defendant negligently performed these duties.

Plaintiff contends that the issue of proximate cause was not properly preserved by defendant, but we disagree. In its post-trial motion before the circuit court, defendant specifically argued in support of its request for judgment notwithstanding the verdict that there was no evidence that "the violation of any duty owed by defendant to plaintiff's decedent was a proximate cause of the injury to and death of plaintiff's decedent." Although defendant has not devoted a specific section of its brief on appeal to the question of proximate cause, plaintiff's failure to establish that any negligence on its part was a proximate cause of the decedent's death was specifically addressed in that brief. The issue is therefore properly before us.

■ The correct standard to be applied in a wrongful death case such as this is succinctly stated in the case of *Hare v. Foster G. McGaw Hospital* (1989), 192 Ill. App. 3d 1031, 549 N.E.2d 778. In *Hare,* Justice Jiganti characterized the causation question as follows:

> "This cause is a wrongful death action based upon the alleged medical malpractice of the defendant, Dr. Labrador. In order to recover for wrongful death, the Wrongful Death Act requires the plaintiff to prove that the alleged negligence caused the death of the decedent. (Ill. Rev. Stat. 1987, ch. 70, par. 1.) The Illinois Supreme Court has stated that to prove causation in a medical malpractice action, the plaintiff must establish that it is more probably true than not true that the negligence was a proximate cause of the injury. [Citation.] To prove proximate cause, the plaintiff must establish that the defendant's negligence was a cause in fact of the death. [Citation.] If the death would have occurred even in the absence of negligence, the negligence was not a cause in fact of the death. The element of

cause in fact need not be proved to a certainty. Rather, the evidence is sufficient if it affords the jury a reasonable basis to conclude that the negligence was 'probably' or 'more likely than not' a cause of the death. [Citations.] Thus, the plaintiff in this action was required to prove that it was more probably true than not that Dr. Labrador's failure to hospitalize Hare was a cause of this death." (192 Ill. App. 3d at 1034-35, 549 N.E.2d at 781.)

While *Hare* involved medical malpractice, the same causation analysis applies to the instant case because both cases were filed under the Act.

■ In the instant case, while there are other possible theories of the cause of decedent's death other than defendant's security deficiencies (*i.e.*, if decedent's killer was one of his co-workers, the killer would have been authorized to be in the area, and no amount of fencing or additional access control may have prevented his confrontation with decedent), we do not believe that the trial court should have granted defendant's motion for a judgment notwithstanding the verdict. Where presentation of direct evidence is impossible, courts are reluctant to conclude that verdicts based upon circumstantial evidence cannot be upheld even though a contrary verdict could have been reached upon the same circumstantial evidence. (See *Yamada v. Hilton Hotel Corp.* (1977), 60 Ill. App. 3d 101, 106, 376 N.E.2d 227, 233 (An action was brought against a hotel owner by two hotel guests due to their being attacked in the defendant's hotel. The *Yamada* court found that a jury question was presented by the two guests who had suffered attacks at the hands of an intruder to their room by virtue of the testimony of a former hotel security employee concerning the inadequacy of the hotel's security despite the fact that there were other theories, unrelated to the hotel owner's negligence, as to how the assailant could have gained access to the victims' room).) The acts or omissions alleged as proximate cause must be a cause in fact but need not be the only cause involved (see *Morton v. F.B.D. Enterprises* (1986), 141 Ill. App. 3d 553, 490 N.E.2d 995), and such matters as cause of death may be established by circumstantial evidence (*Hamel v. Delicate* (1968), 104 Ill. App. 2d 241, 244 N.E.2d 401).

■ The evidence in this case clearly showed a homicide as opposed to a self-inflicted fatal wound. The evidence further showed that, although no acts of personal violence had taken place on defendant's parking lots, there were reported incidents of crimes against property, one of which had resulted in a security guard pulling his weapon. Plaintiff's expert, Marvin Tunis, testified by deposition that

the security at the Nash Street lot was "grossly inadequate." The particular deficiencies cited by Tunis were essentially the same as those alleged in plaintiff's complaint. They included inadequate lighting, absence of fencing, and no access control. Tunis testified that defendant should have assigned a security officer specifically to the parking lot instead of relying on a single patrol officer who was required to patrol and inspect all of defendant's numerous parking areas. He faulted defendant for not having closed-circuit television to observe the parking lot, for not having an elevated observation platform or shelter in the parking lot where security officers could be stationed, and for not allowing the guards stationed at the gate adjacent to the lot to carry firearms. He also recommended additional roving patrols through the parking lot. Defendant's own expert believed that additional measures could have been taken to minimize the risk of harm to decedent.

The dissenting opinion places great reliance on *N.W. v. Amalgamated Trust & Savings Bank* (1990), 196 Ill. App. 3d 1066, 554 N.E.2d 629; however, we find that case distinguishable from the case before us. In *N.W.*, a tenant brought a negligence action against both the owners and the manager of her apartment building to recover damages for injuries she sustained after an unidentified intruder broke into her apartment and sexually assaulted her. The police investigating the crime were of the opinion that the assailant had entered the apartment building through the rear entrance of the building due to a broken lock on a door which the landlords had agreed to maintain. In affirming the summary judgment entered in favor of the defendants, our colleagues on the First District Appellate Court found that the sexual assault was not foreseeable and that the landlords' failure to repair the lock on the building's rear door was not a proximate cause of the sexual assault. In *N.W.*, the plaintiff admitted in her deposition that during the years she resided at the defendants' building she was unaware of any criminal acts committed in the building. Additionally, there were no affidavits or other documents showing previous occurrences of criminal activity in the building. As previously discussed, in the instant case there was evidence of prior criminal acts which made the attack on the decedent foreseeable. Moreover, we have found that in this case, filed under the Wrongful Death Act, there was enough evidence to raise an issue of fact for proximate cause. Finally, we point out that *N.W.* involved a landlord-tenant relationship, whereas the instant case involves an employer-employee relationship in which the employer has voluntarily undertaken the responsibility to keep its employees safe while on the

company's parking lots. For all these reasons, we believe that *N.W.* and the instant case are distinguishable.

Considered as a whole, plaintiff's evidence clearly met the causation standards noted above, and this cause was properly submitted to the jury. Also based on the record as a whole, the jury had sufficient evidence before it to properly reach the verdict which they returned into court. Therefore, we find that the trial court did not err in denying defendant's motion for a judgment notwithstanding the verdict. Additionally, we find that the verdict was not against the manifest weight of the evidence.

■ Defendant next contends that the trial court erred in denying its alternative motion for a new trial because the court erred in certain rulings concerning both the admission and the exclusion of evidence. First, defendant argues that the trial court erred in admitting evidence of previous incidents on defendant's Nash Street parking lot. In support of its argument, defendant cites the case of *Taylor v. Hocker* (1981), 101 Ill. App. 3d 639, 428 N.E.2d 662, in which we held that a shopping mall owner's knowledge that shoplifting and thefts had occurred in and on the premises was not sufficient to give rise to a *duty* to protect customers from assaults from third persons. We did not say that previous reports of crimes against property were inadmissible to prove *notice* on the part of the defendant of the danger of criminal attacks.

In *Rowe v. State Bank* (1988), 125 Ill. 2d 203, 531 N.E.2d 1358, our supreme court took into consideration previous incidents of criminal activity on a landowner's property, along with additional information, in considering whether criminal actions were foreseeable as a matter of law. (125 Ill. 2d at 227, 531 N.E.2d at 1369.) Interestingly, in *Rowe*, the incidents of previous crimes all pertained to crimes against property while the incident in question pertained to crimes against a person, namely, personal injuries sustained by an attack and a shooting, just as we are faced with in the instant case. Relying on *Rowe*, we believe the previous reports of criminal activity were admissible to prove notice on the part of defendant.

Second, defendant contends that the verdict was against the manifest weight of the evidence due in part to the testimony of plaintiff's expert who, according to defendant, improperly considered incident reports other than reports which were allowed by the court's *in limine* order and testified to conclusions from incident reports that were not supported by the evidence.

■ Error in the exclusion or the admission of evidence does not require reversal where there has been no prejudice or where the

result of the trial has not been materially affected. (*Ford v. City of Chicago* (1985), 132 Ill. App. 3d 408, 414, 476 N.E.2d 1232, 1237.) A verdict will only be overturned if it is palpably erroneous, wholly unwarranted, is clearly the result of passion or prejudice, or appears to be arbitrary, unreasonable, and not based upon the evidence. *Young v. City of Centreville* (1988), 169 Ill. App. 3d 166, 177, 523 N.E.2d 621, 628.

While plaintiff's expert did draw conclusions from evidence that had been excluded by the court's *in limine* order, we find this error to be harmless. First, defendant's own security expert, David Smith, admitted that the risk of harm could have been minimized by lighting the parking lot, having a guard on the parking lot, having a guard in an elevated station, fencing the lots, and controlling access to the parking lots. Second, defendant had the opportunity to cross-examine plaintiff's expert on his conclusions, thereby giving defendant not only the opportunity to point out erroneous conclusions, but also to argue that plaintiff's expert drew erroneous conclusions from the data. Finally, plaintiff's expert would not state that any of his suggested measures would have necessarily prevented decedent's death and further admitted that the crime could have occurred at another location on defendant's property. Any harm that may have resulted from plaintiff's expert's testimony was not so prejudicial as to require reversal, and we do not believe that the verdict was palpably erroneous or wholly unwarranted.

Defendant next argues that the trial court erred in overruling defendant's objections to security guard Luekerath's testimony and in allowing evidence that the gate guards were unarmed.

Whether evidence is relevant is within the discretion of the trial court and its determination will not be disturbed on review unless a reviewing court determines there has been an abuse of discretion. (*Chladek v. Albon* (1987), 161 Ill. App. 3d 884, 888, 515 N.E.2d 191, 194.) A review of the record in the instant case leads us to believe that the trial court did not abuse its discretion in allowing Luekerath's testimony, including references that the gate guards were unarmed on the night of decedent's death. Reasonably, an armed security guard would be more of a deterrent to criminal activity than an unarmed guard. Therefore, the question whether the guards were armed was relevant to the question whether defendant breached its duty of care to decedent, and the trial court did not err in allowing this testimony.

The next contention raised by defendant is that the trial court erred in permitting plaintiff's expert to testify concerning the

significance of a statement made by the guard, Luekerath, that he would be reluctant to approach someone on the parking lot if he did not have a gun.

Defendant contends that allowing plaintiff's expert to testify concerning this statement constituted reversible error because the statement was not substantive evidence since it came from a deposition and there was no showing that it was the type of statement reasonably relied upon by experts in the security field. What defendant fails to consider, however, is that there was substantive evidence introduced at trial through Luekerath's testimony that he would be reluctant to approach someone on the parking lot if he did not have a gun.

The record shows that during questioning of Luekerath by plaintiff's attorney the following colloquy ensued:

"Q. Now, in May of 1981, did you go onto the parking lot?

A. No, I didn't. I was to stay at my post.

Q. Was the possession of a firearm necessary in order to go on the parking lot?

A. No.

Q. You stopped going onto the parking lot after they took away your guns?

A. Yes. Could I elaborate on that?

Q. Sure.

A. We had—

MR. McDONNELL [Attorney for defendant]: Just a moment, your Honor. He has impeached him by bringing out testimony that he had a gun. Now, any questions as to what he would have done if he did not have a gun are, therefore, immaterial, have no relevance to any issues in this case.

MR. STERLING [Attorney for plaintiff]: Your Honor, I think that it is very imperative along the lines that we have discussed prior when we had the motion, the hearing on the motion *in limine.*

THE COURT: Rephrase your question, please.

Q. (by Mr. Sterling) All right. Is the possession of a firearm necessary in order to go out on the parking lot?

A. No.

Q. Do you remember, sir, when your Deposition was taken in this case on May 16, 1985?

A. Yes.

Q. And you were placed under oath at that time?

A. Yes.

Q. And this is at page 11. Do you remember at line 10, do you remember the following question, 'Why is the possession of a firearm necessary in order to go on the parking lot? Answer: Because you don't know what they are going to have on the parking lot. A car that pulls in, a carload of people, and here I am, walk over. I have nothing but fists to fight them, and you say, "What are you doing on this parking lot?" They poke a gun in your face or something. When our patrolman and supervisor carries a gun, why should I go over and risk my life?' Do you remember that question and that answer?

MR. McDONNELL: Your Honor, I object to this and move it be stricken as absolutely irrelevant to any issue in this case. He has just impeached him by showing that he had a gun on the night this killing occurred. Therefore, what he would have done without a gun is immaterial and has no bearing on the issues.

THE COURT: Overruled. You may answer.

Q. (by Mr. Sterling) Do you remember being asked that question and giving that answer?

A. Yes.

Q. Was that true at the time you gave it?

A. Yes.

Q. Is that still true today?

A. If I am going to go over and approach somebody that is breaking in a car, I would want some kind of a weapon. Our employees that go into that parking lot do not approach people breaking in cars or something. I would want some kind of protection if I was to do that."

Clearly, Luekerath testified *at trial* that he would want to be armed with a gun before approaching anyone on the lot who was not supposed to be there. Therefore, defendant's argument that there was no substantive evidence that security guards did not want to venture out on the parking lot without a gun is without merit.

■■ Defendant also contends that the trial court erred in refusing defendant's offer of proof of prior incidents of trespass on defendant's property notwithstanding the existence of fencing. Defendant argues that it should have been allowed to rebut the inference created by plaintiff that if fencing had been erected, it could have prevented decedent's death. Defendant wanted to introduce evidence of three prior incidents which had occurred on defendant's property in areas where fences were erected. In two of these incidents, individuals had climbed over the fences and had been apprehended. In the third incident, an unidentified person had cut a hole in the fence. The trial

court rejected the introduction of these three incidents because they were not in keeping with its prior *in limine* ruling limiting incidents to those involving theft, vandalism, and acts against persons on the lot in question. None of the incidents defendant attempted to introduce occurred on the lot in question.

We find no error in the trial court's ruling that these incidents were beyond its motion *in limine*. While defendant is correct that when evidence of a particular matter is introduced, and a party will be unfairly prejudiced if not given the opportunity to respond to such testimony, generally a response must be permitted (*Trower v. Jones* (1988), 121 Ill. 2d 211, 219, 520 N.E.2d 297, 301), defendant has not convinced us that it was prejudiced by not being allowed to introduce the evidence of these three prior incidents concerning fencing. As plaintiff points out in her brief, the first two incidents involved persons who had climbed a fence and had been apprehended. Therefore, the fence served its purpose in limiting access, as two people were caught in an area in which they were not supposed to be. Likewise, the third incident involving a hole being cut in the fence does not show that the fence did not limit access. Even though a hole was cut, there was no evidence that anyone actually crossed the fence line. While it is arguable that this evidence could have been admitted, we do not find that the trial court's denial of it constituted reversible error.

The final issue raised by defendant is that the trial court committed reversible error in instructing the jury. Defendant specifically complains that the trial court erred in giving plaintiff's instructions numbers 16, 18A, 22, and 26. The contested instructions read as follows:

Plaintiff's instruction number 16:

"The defendant undertook the duty, by contract with its employees, to protect its employees while they were on the defendant's property. To perform that duty, the defendant was obligated to use reasonable care to anticipate, and to protect the plaintiff's decedent from criminal activity by third persons while the plaintiff's decedent was on the defendant's parking lots."

Plaintiff's instruction number 18A:

"The plaintiff alleges that it was the contractual duty of the defendant to guard and protect its employees while they were on the plant property and that this duty included an obligation by the defendant to anticipate and guard against the criminal activity of others.

The plaintiff claims that the defendant failed to exercise reasonable care in the performance of the defendant's contractual duty in one or more of the following respects:

\* \* \*

d. Failed to take sufficient steps to deny access to persons not authorized or invited to be on the parking lot.

or

e. Decreased the security of the plaintiff's decedent by taking the hand guns away from the gate guards who guarded the entrance to the plant."

Plaintiff's instruction number 22:

"An employer may be held liable to its employee, for harm which the employee suffers as a result of a criminal attack upon him on the employer's premises, if the employer's negligence has permitted criminal acts by third persons on its premises and if the criminal acts were reasonable foreseeable."

Plaintiff's instruction number 26:

"It was the duty of the defendant to use ordinary care to provide the plaintiff's decedent, George Vaughn, with a reasonably safe place in which to do his work. The plaintiff's decedent, George Vaughn, should be considered as being at his place of work when he had parked on the defendant's Nash Street parking lot in order to report for work as a hod carrier for the defendant."

We have previously discussed the fact that defendant did, in fact, owe a duty to decedent and that plaintiff did present a theory under which she could recover. A careful review of the contested instructions shows that defendant is arguing that there was no duty owed by it to plaintiff's decedent. Because we have previously found that defendant did owe a duty to the decedent, we find no reason to address each contested instruction separately, but find that, as a whole, the jury instructions were sufficiently clear so as not to mislead the jury and fairly and correctly stated the law. *Kane v. Northwest Special Recreation Association* (1987), 155 Ill. App. 3d 624, 508 N.E.2d 257, 261.

For the foregoing reasons, the judgment of the circuit court of Madison County is affirmed.

Affirmed.

RARICK, P.J., concurs.

JUSTICE HARRISON, dissenting:

Under Illinois law, proximate cause is a term of art which encompasses the distinct concepts of cause in fact and legal cause. A plaintiff who fails to establish the first of these elements, cause in fact, has not sustained his burden of making a *prima facie* case in negligence. Cause in fact can be established only where there is a reasonable certainty that the defendant's conduct caused the injury. If no facts are put forth by the plaintiff to show that the injuries sustained were caused or contributed to by an act or omission of the defendant, a judgment based on such evidence cannot be sustained. (*Morton v. F.B.D. Enterprises* (1986), 141 Ill. App. 3d 553, 559-60, 490 N.E.2d 995, 999.) This is such a case. Defendant's motion for judgment notwithstanding the verdict should have been granted.

In reaching a contrary conclusion, the majority applies the wrong standard for establishing proximate cause. The majority contends that plaintiff here was not, in fact, required to prove causation to a "reasonable certainty." This is manifestly incorrect. The "reasonable certainty" standard has been uniformly followed in this district (141 Ill. App. 3d at 559-60, 490 N.E.2d at 999; *Cornstubble v. Ford Motor Co.* (1988), 178 Ill. App. 3d 20, 34, 532 N.E.2d 884, 893) and elsewhere (see, *e.g.*, *N.W. v. Amalgamated Trust & Savings Bank* (1st Dist. 1990), 196 Ill. App. 3d 1066, 1076, 554 N.E.2d 629, 637; *Kennedy v. Joseph T. Ryerson & Sons, Inc.* (1st Dist. 1989), 182 Ill. App. 3d 914, 919, 538 N.E.2d 748, 750; *McCormick v. Maplehurst Winter Sports, Ltd.* (2d Dist. 1988), 166 Ill. App. 3d 93, 98, 519 N.E.2d 469, 473; *Lang v. B.I.T., Inc.* (3d Dist. 1981), 96 Ill. App. 3d 37, 39, 420 N.E.2d 767, 769). While a lower threshold may suffice in medical malpractice actions, medical malpractice obviously has nothing to do with this litigation. The majority's reliance on *Hare v. Foster G. McGaw Hospital* (1989), 192 Ill. App. 3d 1031, 549 N.E.2d 778, is therefore completely misplaced.

The majority makes much of the fact that defendant's expert witness conceded on cross-examination that additional security may have reduced the risk of harm to the decedent. This tentative conclusion, however, scarcely approaches the level of "reasonable certainty" necessary to establish proximate cause. In any case, I fail to see how it adds anything of value to the resolution of this appeal. There is no question that decedent, and everyone else on defendant's premises for that matter, would have been safer, at least from certain perils under certain circumstances, if additional security measures had been implemented. To recover, however, plaintiff had to show more than just

this. She needed to prove that one or more of the particular security deficiencies identified at trial caused or contributed to the specific circumstances that led to the decedent's death.

This she could not do. No one at trial could substantiate the existence of the requisite causal link, and that link is scarcely self-evident. For example, plaintiff's expert criticized the absence of fences and inadequate access control. But as the majority itself points out, if the decedent's killer were one of his co-workers, the killer would have been authorized to be in the area, and no amount of fencing or additional access control may have prevented his confrontation with the decedent.

Improved lighting, surveillance, patrolling, and arming the guards likewise may have done absolutely no good. According to the record before us, their principal benefit apparently would have been deterrence. If, however, the decedent were killed in the heat of passion during an argument, nothing the defendant could have done would have deterred the killer. Deterrence, after all, depends on a considered appraisal of risk, and crimes of passion, by definition, are devoid of any sort of considered judgment.

Because there was absolutely no evidence, direct or otherwise, as to why or by whom the decedent was killed, and because the circumstances leading to the decedent's shooting death are largely a mystery, each of these possibilities and many others are as likely to have taken place as any scenario offered by plaintiff. Any conclusion that defendant's security deficiencies were linked in any way to decedent's death would therefore be purely speculative. This is fatal to plaintiff's case, for it is fundamental that in a negligence action the jury must base its decision on evidence, not on guess or speculation. Liability cannot be predicated upon surmise or conjecture as to the cause of the injury. *Morton v. F.B.D. Enterprises* (1986), 141 Ill. App. 3d 553, 560, 490 N.E.2d 995, 999.

The circumstances before us closely parallel those in *N.W. v. Amalgamated Trust & Savings Bank* (1990), 196 Ill. App. 3d 1066, 554 N.E.2d 629, a recent decision by a unanimous panel of the Appellate Court, First District. In that case, a tenant brought a negligence action against the owners and manager of her apartment building to recover damages for injuries she sustained after an intruder broke into her apartment through the kitchen door and sexually assaulted her. The tenant argued that defendants should be held liable for this attack because (1) they failed to repair the lock on the building's rear entrance, and (2) it was through this unlocked back door that the as-

sailant was able to gain access to the tenant's kitchen door prior to the assault.

The problem, as here, was that the identity of the assailant was completely unknown. There was no evidence that he was not simply another tenant, or a social guest of a tenant, who would have had access to the plaintiff's kitchen door regardless of whether the rear entrance was locked. In the view of the appellate court, this defeated the tenant's action, even assuming, for the sake of argument, that the assault was reasonably foreseeable or that defendants had, in fact, engaged in a voluntary undertaking to protect the tenant from criminal activity. According to the court:

> "The only piece of evidence supporting the plaintiff on the issue of proximate cause is the fact that the lock was inoperable on the night of the attack and, hence, a mode of access to plaintiff's apartment was available. From this the plaintiff infers that the assailant entered the building through the unlocked rear entrance. Such an inference would be quite reasonable but for the fact that access to the plaintiff's kitchen door was also available to other tenants and their social guests. A mere possibility of a causal connection is insufficient to raise the requisite inference of fact." (196 Ill. App. 3d at 1077, 554 N.E.2d at 637.)

The court therefore affirmed summary judgment in favor of defendants.

Although the present case is before us following a jury trial, not simply a summary judgment, the failure of proof on the question of proximate cause is no less complete. To affirm the jury's verdict under the circumstances present here would be tantamount to holding that defendant must be an insurer of the safety of everyone lawfully on its premises. While I am naturally sympathetic to the decedent's widow and his children, the law of this State will not countenance such a result. I therefore dissent.